**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**DRAGAS MANAGEMENT CORPORATION,**

      **Plaintiff,**

**v.**                                        **Civil Action No. 2:10cv547**

**HANOVER INSURANCE CO.,** *et al.*,

      **Defendants.**

**MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Introduction**

      Hanover Insurance Co. and Citizens Insurance Company of America (collectively "Hanover") insured The Porter-Blaine Corporation ("Porter-Blaine") when Porter-Blaine installed Chinese drywall in homes being constructed by Dragas Management Corporation ("DMC") at housing communities known as The Hampshires at Greenbrier ("The Hampshires") and Cromwell Park at Salem ("Cromwell Park").    DMC filed an arbitration claim against Porter-Blaine for damages incurred by DMC from settling homeowner claims and remediating homes containing Chinese drywall.   Hanover defended Porter-Blaine in that arbitration action through a full evidentiary hearing.

      On October 7, 2010, the arbitrator awarded DMC $4.9 million in damages against Porter-Blaine, and that arbitration award was converted to a final judgment in Virginia Beach Circuit Court on November 12, 2010.  Porter-Blaine reportedly has no assets and therefore cannot pay the judgment.  Hanover also refused to pay the judgment, even though it had defended against DMC's claims throughout the arbitration.

Va. Code Ann. § 38.2-2200 provides a mechanism for judgment creditors like DMC to directly sue the insurers of judgment debtors like Porter-Blaine.  In this action, DMC stands in the shoes of Porter-Blaine in seeking to force Hanover to comply with its coverage obligations – in fact, the statute provides that DMC could have filed this suit in the name of Porter-Blaine instead of in its own name.

Via this action, DMC has pursued its remedies under this statute and other related causes of action available to it under Virginia law (e.g., as a third-party beneficiary).  While this case was just recently filed, given the undisputed fact of the judgment against Porter-Blaine, there are no material disputes of fact that should prevent the Court from entering summary judgment at an early stage.[1]  There certainly is no basis for Hanover to argue (as BMIC has done in the companion Chinese drywall insurance coverage case involving DMC) that Porter-Blaine is not "legally obligated" to pay the judgment awarded to DMC.

Furthermore, DMC seeks only <u>partial</u> summary judgment, in the sense that it is moving only on the Hanover primary policies that insured Porter-Blaine during the period November 15, 2005 – November 15, 2006 and the period November 15, 2006 through November 15, 2007 (collectively, the "Hanover Policies").  The reason that DMC is limiting this Motion to these two policies is that neither of these Hanover Policies contains the "Total Pollution Exclusion" endorsement that is contained in other Hanover policies applicable to later years and to excess

---

[1] Additionally, it is important to note that this action is not the first occasion DMC and Hanover have had to litigate their disputes arising out of Porter-Blaine's installation of Chinese drywall at The Hampshires and Cromwell Park. DMC was an "additional insured" on the policies Hanover issued to Porter-Blaine by virtue of the language of the policies (which through a "Special Broadening Endorsement" (Virginia) provide that additional insured status is conferred on "any person or organization with whom you agreed, because of a written contract, written agreement or permit to provide insurance ….")  and by Certificates of Liability Insurance that were issued to DMC by Hanover's agent evidencing DMC's status as an additional insured.  This status as an additional insured is the basis of the third-party complaint that DMC filed against Hanover in a parallel suit initiated by Builders Mutual Insurance Company ("BMIC").  Discovery in that case has been proceeding for many months and involves the same facts that underlie this action.

layers of coverage.   Thus, since there is no applicable pollution exclusion, no discovery is necessary on that issue and the Court can rule at this early stage.   For these reasons and those discussed below, the Court should grant this Motion for Partial Summary Judgment.

**Statement of Undisputed Facts**

Many of the facts recited herein, though undisputed, are non-essential to the disposition DMC seeks.   DMC is simultaneously filing a separate Motion for Partial Summary Judgment against BMIC in the parallel Civil Action No. 2:09-cv-185, and many of the facts cited herein provide helpful context demonstrating the interplay between the two cases.

**The Affected Projects – The Hampshires**

Located in Chesapeake, Virginia, The Hampshires is a housing community consisting of 178 condominiums developed and sold by Hampshires Associates, LC.  Hampshires Associates, LC is a Virginia limited liability company whose members are and always have been DMC, Helen E. Dragas, Anita Dragas Weaver, Mary Dragas Shearin and Jennifer Dragas Stedfast. Until January 1, 2007, DMC was not only a member of Hampshires Associates, LC, but also served as the Manager of Hampshires Associates, LC.  On January 1, 2007, as part of an overall reorganization, DMC was replaced as Manager by Dragas Associates, Inc.  DMC's shareholders (and Dragas Associates, Inc.'s shareholders) are and always have been Helen E. Dragas, Anita Dragas Weaver, Mary Dragas Shearin and Jennifer Dragas Stedfast.  (Declaration of Helen E. Dragas ("Dragas Decl.") ¶¶ 2-6).

DMC served at all times as the General Contractor for construction of the Hampshires project.   Both before and after January 1, 2007, DMC supervised and was responsible for managing the subcontractors hired to perform the construction activities necessary to build the

Hampshires project.  The drywall portion of the Hampshires' construction project was performed by Porter-Blaine.  (Id. at ¶¶ 7-8).

Via a Sub-Contract Agreement dated February 3, 2005 (the "Hampshires Sub-contract"), Porter-Blaine agreed with Hampshires Associates, LC to procure and install drywall at The Hampshires.  (Id. at ¶ 9, Ex. A).  The Hampshires Sub-contract defines Porter-Blaine as "Subcontractor" and Hampshires Associates, LC as "Contractor."  DMC executed the Hampshires Sub-contract as Manager of Hampshires Associates, LC.  With regard to insurance, the Hampshires Sub-Contact provides as follows:

> Subcontractor hereby agrees to carry… Comprehensive General Liability Insurance, with Contractor being named as an ADDITIONAL INSURED, and with limits of at least One Hundred Thousand Dollars ($100,000.00) per person, Three Hundred Thousand Dollars ($300,000.00) per accident/ property damage liability, and One Million Dollars ($1,000,000.00) per accident, Two Million Dollars ($2,000,000.00) aggregate property damage liability, including products and completed operations, … . Subcontractor agrees to supply Contractor with insurance certificates and policy endorsements evidencing additional insured status of the Contractor.

(Id., Ex. A).  Pursuant to DMC's request, on or about November 9, 2005, February 1, 2006,  and November 14, 2006, DMC was supplied Certificates of Liability Insurance reflecting both DMC and Hampshires Associates, LC as Certificate Holders and additional insureds under the Hanover Policies.  (Declaration of Robert Makin ("Makin Decl.") ¶ 7, Ex. A).

On January 1, 2007, in connection with the same reorganization referenced above, Hampshires Associates, LC and DMC entered into an Assignment relating to the Hampshires Sub-Contract, as well as multiple other Assignments relating to other subcontracts connected to the Hampshires project.  (Id. at ¶ 15, Ex. B).  Also on January 1, 2007, Hampshires Associates, LC and DMC entered into a General Contract Agreement between Owner and Contractor (the

"General Contract Agreement").   (Id. at ¶ 16, Ex. C).   The General Contract Agreement formalized the understanding that had always existed between DMC and Hampshires Associates, LC (and the other single-purpose limited liability companies formed by DMC's individual stockholders for other real estate development projects) regarding DMC's responsibility, as the supervisor and manager of all construction activities for all projects, for the construction work performed via subcontractors to build the Hampshires project.   (Id. at ¶ 17).

**The Affected Projects -- Cromwell Park**

Located in Virginia Beach, Virginia, Cromwell Park is a housing community consisting of 132 condominiums developed and sold by Dragas Associates X, LC.   Dragas Associates X, LC is a Virginia limited liability company whose members are and always have been DMC, Helen E. Dragas, Anita Dragas Weaver, Mary Dragas Shearin and Jennifer Dragas Stedfast. Until January 1, 2007, DMC was not only a member of Dragas Associates X, LC but also served as the Manager of Dragas Associates X, LC.   On January 1, 2007, as part of an overall reorganization, DMC was replaced as Manager by Dragas Associates, Inc.  DMC served at all times as the General Contractor for construction of the Cromwell Park project. DMC supervised and was responsible for managing the subcontractors hired to perform the construction activities necessary to build the Cromwell Park project.   The drywall portion of the Cromwell Park construction project was performed by Porter-Blaine.  (Dragas Decl. at ¶¶ 10-15).

Via Sub-contract Agreements dated December 4, 2003, July 30, 2004, September 28, 2004 and September 20, 2005 (the "Cromwell Park Sub-contracts"), Porter-Blaine agreed with Dragas Associates X, LC to procure and install drywall at Cromwell Park.  (Id. at ¶ 16, Ex. B). With regard to insurance, the Cromwell Park Sub-contracts contain language materially identical to that contained in the Hampshires Sub-contract.  (Id., Ex. B).  Pursuant to DMC's request, on

or about November 9, 2005, February 1, 2006, and November 14, 2006, DMC was supplied Certificates of Insurance reflecting both DMC and Dragas Associates X, LC as Certificate Holders and additional insureds under the Hanover Policies.  (Makin Decl. ¶ 7, Ex. A).

**Porter-Blaine's Purchase and Installation of Chinese Drywall**

Porter-Blaine installed Chinese drywall at a total of seventy-four (74) homes at the two projects – sixty-eight (68) at The Hampshires and six (6) at Cromwell Park.  (Declaration of Brian D. Kokoska ("Kokoska Decl.") ¶ 16).  A chart listing the seventy-four (74) affected homes by project, address and the date on which each home received its Certificate of Occupancy is attached as Exhibit A to the Kokoska Declaration.  To perform the installation, Porter-Blaine itself used subcontractors.  (Sam Porter Arbitration Testimony, p. 846, attached as **Exhibit 1**).

In early 2009, after learning of the existence of Chinese drywall in these homes via complaints by homeowners and other sources, DMC quickly notified Porter-Blaine, and its insurer Hanover, of Chinese drywall claims.  After meeting with representatives of Porter-Blaine on February 6, 2009, and sharing with Porter-Blaine information concerning DMC's investigation of the problem, DMC wrote Porter-Blaine's lawyer and the Hanover representative identified by Porter-Blaine as having responsibility for DMC's claims on February 20, 2009. (Decl. of Kristan B. Burch, Esq. ("Burch Decl.") at ¶ 23).

In counsel's letter of February 20, 2009, DMC specifically notified Hanover of its claims against Porter-Blaine and its claim to "additional insured" status under the Hanover Policies and its request for a response no later than February 27, 2009.  (Id., Ex. A).  On March 4, 2009, Hanover acknowledged receipt of DMC's claim.  (Id., Ex. B).

On March 19, 2009, DMC sent Hanover a letter, with enclosures, containing information transmitted to BMIC on March 11, 2009, namely details of the issues being faced by DMC and

DMC's plans for action. (Id., Ex. D). On April 28, 2009, having heard nothing further from Hanover, DMC sent Hanover another letter reiterating its claim to "additional insured" status and for insurance coverage for the property damage caused by Porter-Blaine's installation of Chinese drywall. (Id., Ex. H).

DMC received no further correspondence from Hanover until receiving a letter from Hanover's counsel on July 31, 2009. In that letter, Hanover, amongst other things, denied DMC's status as an "additional insured." (Id., Ex. J). DMC had already begun negotiating and entering into settlement agreements with affected homeowners. (Kokoska Decl. ¶ 21). The settlement agreements, titled Remediation Authorization and Agreement, included a release by homeowners of all property damage claims against DMC. (Id. at ¶ 22, Ex. B). Pursuant to the settlement agreements, DMC ultimately paid to remove all of the Chinese drywall, much of which had to be removed in any event to repair and replace other damaged components (e.g., where copper piping had to be removed), replace corroded HVAC coils and other affected mechanical and electrical equipment, replace carpet that had been damaged by odor, and otherwise repair or replace all of the damaged elements of the homes. (Id., Ex. B). In addition, DMC paid the homeowners' relocation expenses, including condominium fees, during the time that it took to complete the remediation, and compensated homeowners for damage to personal property items. (Id., Ex. B).

In total, seventy-three (73) settlement agreements for such remediation were executed. (Id. at ¶ 23). All such agreements were entered into after February 2009. (Id. at ¶ 24, Ex. C). A chart setting forth the dates of the settlement agreements, the approximate commencement of remediation work, and final inspection and acceptance of remediation, is attached as Exhibit C to the Kokoska Declaration.

At all relevant times, DMC relied on the written and verbal communications with Hanover when they occurred.  Such communications materially influenced DMC's decision-making in regard to Chinese drywall problems at The Hampshires and Cromwell Park.  (Dragas Decl. ¶¶ 46-47).

**The Property Damage Caused by Chinese Drywall**

After discovering that Chinese drywall had been used by Porter-Blaine on the Hampshires and Cromwell Park projects, DMC inspected over 130 homes at the two projects at homeowners' requests.  As compared to homes that were determined not to have Chinese drywall, homes with Chinese drywall had visible and distinctive corrosion tarnish on electrical wiring, copper tubing of HVAC coils and copper gas lines.  In addition, analysis of HVAC service records at The Hampshires and Cromwell Park revealed that at least twenty-eight (28) of the seventy-four (74) Chinese drywall homes had experienced an HVAC coil failure, requiring replacement; some homes as many as three times.  This represents a failure rate of over thirty-seven percent (37%).  In contrast, over the same time period, only two of two hundred thirty-six (236) homes that did not have Chinese drywall had experienced a coil failure, or less than one percent (< 1%).  (Kokoska Decl. ¶¶ 15-20).  After consideration of all the evidence, the arbitrator concluded that the damage, such as the corrosion tarnish found on HVAC coils, electrical wiring and copper gas lines in the seventy-four (74) affected homes, was caused by the Chinese drywall in those homes.  (Burch Decl., Ex. K).

**DMC's Action Against Porter-Blaine**

On June 26, 2009, DMC filed a Demand for Arbitration seeking to recover from Porter-Blaine the damages DMC incurred as a result of the Chinese drywall at the Developments.  Hanover defended Porter-Blaine in the arbitration over the course of  a five day hearing on June

28-30 and July 1 and 24, 2010 conducted by an independent arbitrator appointed by the American Arbitration Association.  On October 7, 2010, the arbitrator ruled in favor of DMC on its claims and awarded $4.9 million to DMC, plus interest and costs.  That arbitration award was converted to a judgment in Virginia Beach Circuit Court by order entered November 12, 2010. (Burch Decl. at ¶¶ 33-36, Exs. K, L).

## The Hanover Policies

Hanover sold Porter-Blaine materially identical commercial general liability insurance policies, Nos. ZBR 7905525 02 and ZBR 7905525 04, for the periods covering November 15, 2005 to November 15, 2006 and November 15, 2006 to November 15, 2007, respectively, true and accurate copies of which are attached hereto as **Exhibits 2** and **3** (the "Hanover Policies"). Each of the Hanover Policies has a $2,000,000 aggregate limit, a $1,000,000 per occurrence limit, and a $2,000,000 products and completed operations aggregate limit.

In relevant part, the Hanover Policies' insuring agreement (Section I, ¶ 1(a)-(b)) provides that:

> [Hanover] will pay those sums that [P-B] becomes legally obligated to pay as damages because of … "property damage" to which this insurance applies.
>
> …
>
> This insurance applies to … "property damage" only if … the … "property damage" is caused by an "occurrence" [and] [t]he "property damage" occurs during the policy period;…

(Exs. 2-3, CGL Coverage Form, p. 1 of 16).

Neither of the Hanover Policies contains the "Total Pollution Exclusion" endorsement that is included in other Hanover primary policies covering years after November 15, 2007 and in excess policies.  The more narrow pollution exclusion that is included in the Hanover Policies

at issue in this Motion contains a number of exceptions and does not apply to the judgment received by DMC against Porter-Blaine.  (Exs. 2, 3, CGL Coverage Form, p. 3 of 16).

On March 3, 2009, after being notified by Porter-Blaine of DMC's claims arising out of the installation by Porter-Blaine of Chinese drywall at The Hampshires and Cromwell Park, Hanover sent Porter-Blaine a reservation of rights letter in which it stated:  "It is our position that while your policy may cover the resulting or consequential property damage, it does not cover the cost to repair or remove and replace your work and/or your products used in connection with the construction of the affected homes."  A true and accurate copy of Hanover's reservation of rights letter is attached hereto as **Exhibit 4**.  Hanover vigorously defended Porter-Blaine in the arbitration commenced by DMC against Porter-Blaine under the reservation of rights.

The Hanover Policies also contained a Commercial General Liability Special Broadening Endorsement (Virginia) (the "Broadening Endorsement") that included within the Hanover Policies' universe of insureds:

> Any person or organization with whom you agreed, because of a written contract, written agreement or permit to provide insurance, … but only with respect to:
>
> (1)     "Your work" for the additional insured(s) at the location designated in the contract, agreement or permit, …

(Exs. 2-3).

The Special Broadening Endorsement expanded the coverage supplied by the Hanover Policies by adding to Section II of the Hanover Policies, titled "WHO IS AN INSURED."  With regard to limited liability companies, Section II, ¶ 1(c) provides as follows:

> … you are an insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers.

In response to an interrogatory in the BMIC suit seeking to identify the specific provision(s) of the Hanover Policies upon which Hanover relies for its denial of coverage to DMC, and the factual basis for same, Hanover objected and referred DMC to the Hanover Policies, its Answer filed in the BMIC suit and correspondence to DMC (presumed to be a July 31, 2009 letter to DMC's then counsel, Jenner & Block). The interrogatories and response and the July 31, 2009 letter are attached hereto as **Exhibits 5** and **6**, respectively.[2]

## ARGUMENT

### I.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U. S. 242, 248-50 (1986).  On a motion for summary judgment, the "movant need not negate his opponent's case; he need only disclose the absence of evidence to support that case." Otto Wolff Handelsgesellschaft, mbH v. Sheridan Transp., 800 F. Supp. 1359, 1361 (E.D. Va. 1992) (citations omitted).  Under Rule 56 (as amended on December 1, 2010) there is no time before which a summary judgment motion may be filed, although such motions cannot be filed more than 30 days after the close of discovery. Fed. R. Civ. P. 56(b).

---

[2] Because this Motion deals solely with DMC's status as a judgment creditor and its right to recover against the Hanover insurance policies of the judgment debtor, Porter-Blaine, DMC's alternative argument for recovery against Hanover as an additional insured is not at issue.  It is DMC's position that, given the language of the broadening endorsement and the issuance of three separate certificates of insurance to DMC and other Dragas entities, there can be no real dispute that DMC is an additional insured.  The need to litigate those issues may be mooted by a ruling in DMC's favor on this motion.

## II.  The Policies Hanover Issued to Porter-Blaine Cover the $4.9 Million Judgment

The dispositive question on this Motion is whether the insurance policies that Hanover issued to Porter-Blaine cover the judgment awarded DMC. Thus, while the Complaint against Hanover includes several counts, each count is resolved by reference to this basic question.

### A.  The Insuring Clause Covers the Judgment

There is no genuine dispute of material fact that the Hanover policies do cover the judgment. As with the BMIC policies at issue in the companion case, the insuring clause of the Hanover policies provides coverage where an insured is "legally obligated to pay [sums] as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Ex. 2, CGL Coverage Form, p. 1 of 16). There is no question that Porter-Blaine is legally obligated to DMC to pay sums to DMC as damages for property damage by virtue of the judgment against Porter-Blaine for $4.9 million.

### B.  The Damages Were Caused By An Occurrence

The Policy applies to property damage caused by an "occurrence," defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions," that occurs within the coverage territory (defined as, at least, the United States). (Id.) Here, the damage was caused by an occurrence, namely the Chinese drywall's installation and subsequent corrosive impacts on wiring, copper tubing, appliances and related items in the homes.

Importantly, the Supreme Court of Virginia has held that the term "occurrence" is ambiguous. S.F. (Jane Doe) v. West Am. Ins. Co., 250 Va. 461, 464-65, 463 S.E.2d 450, 452 (1995) ("[W]e are of the opinion that the definition of occurrence in West American's insurance contract is indeed ambiguous because it is susceptible to numerous interpretations.")  Thus, to

the extent there is any question about whether an "occurrence" happened in this case, that issue should be construed against Hanover and in favor of DMC and coverage.  See id. ("Because the definition of occurrence is ambiguous, we must construe the policy in favor of the insureds ….")

In addition, as this Court has recognized, the Fourth Circuit held in Stanley Martin Companies v. Ohio Casualty Group, 313 Fed. Appx. 609, 613-14 (4th Cir. 2009) (unpublished opinion applying Virginia law) that "damage a subcontractor's defective work causes to an insured's nondefective work constitutes an occurrence."  See also French v. Assurance Co. of Am., 448 F.3d 693 (4th Cir. 2006) (holding that breach of contract liability for damage to nondefective structure and walls of home caused by moisture intrusion through defectively-installed cladding constituted an occurrence);  Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65 (Wis. 2004) (holding that general contractor's breach of contract liability for defective work of subcontractor constituted an occurrence).[3]

Importantly, it is undisputed that Porter-Blaine, via subcontractors it hired, installed the Chinese drywall and that the Chinese drywall damaged other components of the homes (it also damaged the personal property of the homeowners by corroding or tarnishing their belongings and damaging wire components).  The Arbitration Award establishes this conclusively.[4]

In sum, legally and factually there is no question that the Chinese drywall loss was caused by an occurrence.

C.     The Number of Occurrences for Which Hanover is Liable

Because there is no dispute as to the material facts, this Court should also rule now on the number of occurrences for which Hanover is liable.  The Supreme Court of Virginia specifically

---

[3] In French, the Fourth Circuit heavily relied upon and quoted from what it called the "Supreme Court of Wisconsin's thoughtful opinion" in American Girl.  448 F.3d at 703.
[4] Additionally, in the parallel BMIC suit, Hanover has served an expert report that concludes the damage was caused by Chinese drywall.

addressed this issue in <u>Jane Doe</u>.  In that case, the Court addressed how many occurrences were at issue where a property manager molested a number of children, each of whom subsequently filed suits against the employer of the manager.  The insurance company argued that the negligent hiring of the manager constituted a single occurrence, and thus that the per occurrence limit in the policy applied a single time, regardless of the number of suits filed.  While the trial court agreed with the insurer, the Supreme Court of Virginia reversed, concluding that the term "occurrence" is ambiguous, since it could refer to the negligent hiring, the negligent retention or the negligent supervision of the employee.  Because the term was ambiguous, the Court determined that it should be interpreted in favor of maximizing coverage – i.e., a separate occurrence for each child.  250 Va. at 464-65, 463 S.E.2d at 452.

The Virginia Supreme Court's decision in <u>Jane Doe</u> teaches important lessons for divining the proper outcome in this case.  First, it endorses the time-tested tenet of the law that it is the insurance carrier's burden to draft unambiguous policy language and, where it does not, courts should default to the policy construction that maximizes coverage for the insured.  <u>Id.</u> Second, and more subtly, the <u>Jane Doe</u> opinion evidences the logic the Court followed in reaching its result.  By discussing the multiple potential theories upon which the insured was liable (negligent hiring vs. negligent supervision vs. negligent retention), the Court focused on the cause of the underlying liability and the insured's responsibility for that cause.  In doing so, the Supreme Court of Virginia travelled an analytic path that finds voice in other decisions of relevance.

For example, twenty years before the Supreme Court of Virginia decided <u>Jane Doe</u>, this Court decided <u>American Casualty Co. v. Heary</u>, 432 F. Supp. 995 (E.D. Va. 1977) (Clarke, J.), which involved the question of how many occurrences were at issue in an automobile insurance

case.  After reviewing two major analytic approaches – the "cause" test and the "effects" test – Judge Clarke concluded that the "cause" test was clearly the modern view and followed it in determining that there was one occurrence, namely the negligent act of the driver.   While the Jane Doe decision renders Judge Clarke's opinion largely moot (indeed, Judge Clarke recognized in his opinion that, at the time, no Virginia state court decision had addressed the issue), his analysis leads to the same result.

Judge Clarke's analysis involves locating the "cause" of the liability.   Heary, 432 F. Supp. at 997 (finding negligence of driver to be occurrence).   Importantly, this determination must be made from the perspective of the particular insured at issue.  Associated Indem. Corp. v. Dow Chem. Co., 814 F. Supp. 613, 623 (E.D. Mich. 1993) (observing that the number of occurrences issue is analyzed "from the insured's point of view" and "is determined by reference only to those 'causes' for which the insured may have shared some responsibility").

Here, the insured under the Hanover Policies was Porter-Blaine, not DMC.  DMC stands in the shoes of Porter-Blaine pursuant to Va. Code Ann. § 38.2-2200, which gives DMC the right to sue Hanover in Porter-Blaine's name.  In other words, DMC effectively *is* Porter-Blaine.

From Porter-Blaine's perspective, there were multiple occurrences per home, because the cause of its liability was its installation of Chinese drywall in each of the multiple homes.  Finding multiple occurrences also maximizes coverage (i.e., is consistent with Jane Doe) because the Hanover Policies do not have a deductible but do have a per occurrence limit of $1,000,000 (and an aggregate limit of $2,000,000).  Thus, from the all-important perspective of the insured, Hanover is liable for multiple occurrences – one from each of the homes in which Porter-Blaine installed Chinese drywall.[5]

---

[5] Because the number of occurrences must be determined from the viewpoint of the particular insured, a court can, and should in some cases, find that there are a different number of occurrences depending on the insured at issue.

In summary, to maximize coverage in this case – which the Court must do given the Supreme Court of Virginia's conclusion that the term "occurrence" is ambiguous – the Court should conclude that Hanover is liable for multiple occurrences.

## III.   The "Your Work" Exclusion Does Not Bar Coverage

Finally, the "your work" exclusion does not bar coverage because, as set forth in the Statement of Undisputed Facts, Porter-Blaine itself used subcontractors to install the Chinese drywall.  The "your work" exclusion contained in the Hanover policies specifically provides that "this exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  (Exs. 2-3, CGL Policy Form, p. 5 of 16).[6]

Furthermore, the repair and replacement of the drywall itself should be covered because it was necessary to prevent further damage to other building components and the homeowners' personal property.  See Scott C. Turner, Insurance Coverage of Construction Disputes, § 8:6 (West 2010) ("If the property that would have been damaged [i.e., the building components and homeowners' personal property] is not the work of the insured, the work performed exclusion should not apply to the cost of repairing or replacing the insured's work in order to prevent the property damage to other property.") (citing authority).

For this reason, the Court should reject any contention that the "your work" exclusion bars coverage and should grant the Motion for Partial Summary Judgment.

---

Associated Indem. Corp. v. Dow Chem. Co., 814 F. Supp. 613, 622-623 (E.D. Mich. 1993).  ("If different parties were sued by the same claimant for the same damage to the same property, and if each party was insured under comprehensive general liability insurance policies issued by the same insurer with the same policy language, there might be a different number of occurrences under each Policy.").  That is exactly what has occurred here.  As discussed in the Motion for Partial Summary Judgment filed by DMC against BMIC in the BMIC suit, from DMC's perspective as the direct insured under the BMIC policies, there were two occurrences – specifically, DMC's decision to hire Porter-Blaine to install Chinese drywall at the two different Developments. This issue is addressed more fully in the BMIC motion but noted here so that the Court can understand the interplay between the various policies involved in these actions.

[6] Any "your work" obstacle to coverage is additionally overcome by virtue of DMC's status as an additional insured. The structure of the Hanover Policies is such that the definition of "your work" means *Porter-Blaine's* work, *not* the

**<u>Conclusion</u>**

For these reasons, the Court should grant the Motion for Partial Summary Judgment and find that the 2005-06 and 2006-07 Hanover Policies cover Porter-Blaine for the $4.9 million judgment awarded DMC and that DMC is therefore entitled to recover $4 million of the judgment from Hanover under those Hanover Policies.

DRAGAS MANAGEMENT CORPORATION


By:  /s/ R. Johan Conrod, Jr.
W. Edgar Spivey (VSB No. 29125)
Kristan B. Burch (VSB No. 42640)
R. Johan Conrod, Jr. (VSB No. 46765)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
Telephone:  (757) 624-3000
Facsimile:  (757) 624-3169
wespivey@kaufcan.com
kbburch@kaufcan.com
rjconrod@kaufcan.com
*Counsel for Dragas Management
Corporation; Hampshires Associates, LC;
and Dragas Associates X, LC*

---

work of any additional insured such as DMC.  For this alternative reason, the Hanover Policies' "your work" exclusion cannot be ultimately effective in barring DMC's claims to coverage.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 31, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF) to the following registered users:

> Thomas S. Garrett, Esq.
> Harman, Claytor, Corrigan & Wellman
> P. O. Box 70280
> Richmond, VA 23255
> (804) 747-5200
> (804) 747-6085 Facsimile
> tgarrett@hccw.com
> *Counsel for Hanover Insurance Company, and Citizens Insurance Company of America*
>
> John Malloy, Esq.
> Robinson & Cole, LLP
> 280 Trumbell Street
> Hartford, CT  06103
> jmalloy@rc.com
> *Counsel for Hanover Insurance Company, and Citizens Insurance Company of America*

>        /s/ R. Johan Conrod, Jr.
> W. Edgar Spivey (VSB No. 29125)
> Kristan B. Burch (VSB No. 42640)
> R. Johan Conrod, Jr. (VSB No. 46765)
> KAUFMAN & CANOLES, P.C.
> 150 West Main Street, Suite 2100
> Norfolk, VA  23510
> Telephone:  (757) 624-3000
> Facsimile:   (757) 624-3169
> wespivey@kaufcan.com
> kbburch@kaufcan.com
> rjconrod@kaufcan.com
> *Counsel for Dragas Management Corporation; Hampshires Associates, LC; and Dragas Associates X, LC*

DOCSNFK-#1691864-v1-

18