UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| DRAGAS MANAGEMENT CORP., : | |
| : | |
| Plaintiff, : | |
| : | Civil Action No. 2:10-cv-547 |
| v. : | |
| : | |
| THE HANOVER INSURANCE COMPANY, : | |
| : | |
| and : | |
| : | |
| CITIZENS INSURANCE COMPANY : | |
| OF AMERICA, : | |
| : | |
| Defendants. : | |

**The Hanover Insurance Company and Citizens Insurance
Company of America's Opposition To Dragas Management Corporation's
Motion For Partial Summary Judgment**

This insurance coverage action arises out of the installation of allegedly defective

Chinese-manufactured drywall ("Chinese Drywall") by Citizens' insured, Porter-Blaine

Corporation ("Porter-Blaine") in housing communities developed by Dragas Management

Corporation or one of its affiliates ("Dragas").  Dragas obtained a $4.9 million arbitration award

against Porter-Blaine for the costs associated with remediating 74 homes that had Chinese

Drywall installed in them, which was subsequently reduced to a judgment, and which Dragas

now seeks to recover from Citizens in this action.

In its motion, Dragas asks this Court to enter judgment in its favor in the amount of $4

million, under the theory that sum is recoverable from Citizens as a matter of law because

Citizens insured Porter-Blaine under two liability policies that each provide coverage in the

amount of $1 million per occurrence and $2 million in the aggregate.  The Court cannot grant Dragas' motion.

In order to recover *any* sums from Citizens, Dragas must establish that the amount it is seeking – here, $4 million – is for a claim that is covered under the relevant Citizens policies. Dragas has not made such a showing, and indeed cannot make such a showing.  As discussed below, the Citizens policies provide coverage only for "property damage" caused by an "occurrence," and in order to be covered, the "property damage" must take place during the periods in which the policies are in effect.  Dragas has presented this Court only with the fact that an award of $4.9 million was entered against Porter-Blaine; it has not shown what portion of that sum (if any) or what portion of the $4 million it asks the Court to award as a matter of law was for "property damage" that was caused by an "occurrence," and has failed to show that it incurred $4 million of "property damage" during the time the Citizens policies were in force. Simply put, the Court cannot make any determination of what sums, if any, Dragas is entitled to recover based upon the undifferentiated general award of $4.9 million in the arbitration. Summary judgment should therefore be denied.

Summary judgment should also be denied because a number of exclusions in the policies may bar or limit coverage, and Citizens needs additional discovery in order to establish the applicability of those exclusions.  In this regard, there is also a factual question as to whether the "your work" exclusion bars coverage, and the Court cannot enter judgment in Dragas' favor on that exclusion, as it requests in its motion.  For these additional reasons, Dragas' motion should be denied.

## **Statement of Undisputed Material Facts**

Citizens respectfully submits that the following material facts are undisputed for purposes of its Opposition to Plaintiff's Motion for Partial Summary Judgment:

**A.    Plaintiff Seeks Millions of Dollars of Insurance Coverage Based Solely On An Award Received In An Arbitration In Which  Insurance Coverage Was Never Considered By The Arbitrator.**

1.      Dragas filed this lawsuit against The Hanover Insurance Company ("Hanover") and Citizens Insurance Co. of America ("Citizens") (collectively, "Defendants") seeking to recover a $4,900,000 arbitration award (the "Arbitration Award") it obtained against The Porter-Blaine Corporation ("Porter-Blaine").  (Compl. ¶¶ 1-3, Exhibit A.)  The Arbitration Award, which Dragas converted to a final judgment in Virginia Beach Circuit Court, is attached to the Complaint at Exhibit A, as well as to Dragas's motion for partial summary judgment. (Rec. Doc. 16-11.)

2.      The Arbitration Award is for damages Dragas allegedly sustained as a result of Porter-Blaine's installation of Chinese Drywall in certain homes at two housing developments built by Dragas.  (Compl. ¶¶ 1, 10.)  Remediation of the units identified as having Chinese Drywall included removing and replacing all drywall in the unit.  (*See* Rec. Doc. 15-2 at ¶¶ 1.n and 1.y.) ("Remediation Authorization and Agreement" describing scope of repairs performed at each unit).  The Arbitration Award was issued to compensate Dragas for the costs incurred in removing and replacing drywall and remediating, among other things, HVAC coils, electrical wiring, and copper gas lines.  Motion at 7.  The Arbitration Award is for a gross sum and does not, for example, distinguish between costs associated with removing and replacing defective drywall, and the cost of repairing damage to other components of the homes that Dragas attributes to the presence of defective drywall.

3.      Exhibit A to Brian Kokoska (Vice President of Production for Dragas)'s declaration indicates all of the units that were identified by Dragas as having Chinese Drywall installed.  (Rec. Doc. 15-1.)  Included in the list of units with Chinese Drywall that were remediated are units 104, 136, 137, 149, and 152.  *Id.*  That Exhibit also shows that many of the homes did not even receive a Certificate of Occupancy until well after the expiration of the 2005-2006 Citizens policy.  *Id.*

4.      The identification and presence of Chinese Drywall does not necessarily result in off-gassing of sulfide gasses or corrosion of metallic surfaces.  Some Chinese Drywall off-gases, some does not.  Some Chinese Drywall causes corrosion, some does not.  This is supported by Plaintiff's own documents indicating that Chinese Drywall was present in some homes where the homeowner had no complaints of either odor or corrosion.  *See* Aff. of J. Malloy at Exh. A.  For instance, Unit 104 was "Positive for ID" for defective drywall, but had "No reported HVAC, appliance, electronics, tarnish, odor, or health issues."  J. Malloy Aff. at Exh. A, p. 1.  Similarly, Unit 136 indicates "Positive for ID" for defective drywall, but "No HVAC failures," "No electronics or appliance failures," "No health issues reported," and "a very mild intermittent odor that he couldn't describe."  *Id.* at p.2.  Unit 137 indicated a "Positive ID" for defective drywall, but "No electrical, HVAC, or odor issues reported."  *Id.* at p.3.  Unit 149 states it is "Positive for ID," but had "No HVAC failures, no appliance or electronics failures, no tarnish issues," "[n]o health issues," and that the owner "thinks he might have smelled a faint sulfurous odor from time to time but he's not sure."  *Id.* at p.4.  Unit 152 states "Positive for ID," and had "[n]o reported HVAC, appliance, electronics, jewelry, odor, or health issues."  *Id.* at p. 5.

5.      Therefore, the Arbitration Award includes an award for damages incurred in removing and replacing Chinese Drywall even when the homeowners did not complain of either odor or corrosion issues.

6.      The Arbitration did not involve any insurance coverage issues.

**B.     The 2005-2006 and 2006-2007 Citizens Policies.**

7.     Citizens issued to Porter-Blaine commercial general liability policy number ZBR 7905525 02 for the policy period of November 15, 2005 to November 15, 2006 (the "2005-2006 Policy").  Citizens also issued a renewal of that policy, which was in force from November 15, 2006 to November 15, 2007 (the "2006-2007 Policy") (together with the 2005-2006 Policy, the "Citizens Policies").  Citizens issued other policies to Porter-Blaine as well, but those policies are not the subject of Dragas' Motion.  (Compl. ¶¶ 15-18.)  The Citizens Policies at issue in this motion are attached to the Affidavit of W. Makimoto as Exhibits A and B.  Each provides a limit of liability of $1,000,000 and $2 million in the aggregate.  (*Id.*)

8.     The Citizens Policies state that Citizens will pay:

> those sums that the insured becomes legally obligated to pay as damages because of . . .  'property damage' *to which this insurance applies*.

W. Makimoto Aff. at Exhs. A-B at p. 1, Section I.1.a (emphasis added).

9.     The Citizens Policies further state that:

> This insurance applies to . . . 'property damage' only if . . . 'property damage is caused by an 'occurrence' . . . .

The term "Property damage" is defined in the policies as

> Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

The term "Occurrence" is defined as

> an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*Id.* at p. 14-15 of 16, Section V.13 and V.17.

10.    The Citizens Policies also limit coverage to "property damage" that takes place during the policy period:

> This insurance applies to . . . 'property damage' only if . . . [t]he 'property damage' occurs during the policy period . . . .

*Id.* at p. 1 of 16, Section I.1.b.

### C.    The Faulty Workmanship Exclusion Bars Coverage For The Claimed Damages.

11.    The "Faulty Workmanship" exclusion bars coverage under the Citizens Policies. The Policies exclude coverage for "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. W. Makimoto Aff. at Exh. A-B, at Form No. CG 00 01 10 01, at pp. 4-5. ("j(6) exclusion").

### D.    Other Exclusions May Bar Coverage, But Further Discovery Is Necessary.

12.    The Citizens Policies include a "Your Work" exclusion which states:

This insurance does not apply to:

* * *

> (l)    "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

W. Makimoto Aff. at Exhs. A-B, Form No. CB 00 01 10 01, at p. 5.  Citizens needs more time to conduct discovery to determine if this exclusion applies.  Aff. of J. Malloy at ¶ 6.

13.  The Citizens Policies contain the following "Performing Operations" exclusion:

This insurance does not apply to:

* * *

"Property damage" to:

\* \* \*

(5)   That particular part of real property on which you or
any contractors or subcontractors working directly or
indirectly on your behalf are performing operations, if
the "property damage" arises out of those operations…"

W. Makimoto Aff. at Exh. A-B, Form No. GG 00 01 10 01, at p. 4 (emphasis added).  Citizens

needs more time to determine if this exclusion applies.  J. Malloy Aff. at ¶ 7.

14.   The Citizens Policies contain an "Impaired Property" exclusion, which states:

This insurance does not apply to:

\* \* \*

m.  Damage to Impaired Property or Property Not Physically
Injured

"Property damage" to "impaired property" or property that has
not been physically injured, arising out of:

(1)   A defect, deficiency, inadequacy or dangerous condition
in "your product" or "your work"; or

(2)   A delay or failure by you or anyone acting on your behalf
to perform a contract or agreement in accordance with its
terms.

This exclusion does not apply to the loss of use of other
property arising out of sudden and accidental physical injury to
"your product" or "your work" after it has been put to its
intended use.

W. Makimoto Aff. at Exhs. A-B, Form No. CG 00 01 12 04, p. 5.  Since Dragas' own documents

establish that it removed and replaced drywall in homes that showed no evidence of damage

caused by the drywall, this exclusion bars coverage for at least a portion of the Arbitration

Award.  Citizens is in the process of taking discovery on this issue in the parallel Builders

Mutual action.  Citizens needs more time to determine if this exclusion applies.  J. Malloy Aff. at ¶ 9.

## Statement of Disputed Material Facts

In its brief, Dragas submits eight pages of what it characterizes as undisputed facts that even Dragas acknowledges are not relevant to its motion.  None of the facts are in numbered paragraphs, making it practically impossible for Citizens to address each and every factual assertion point-by-point.  As to the facts set forth on pages 3 through 11 and characterized as "undisputed," Citizens has not had adequate time to conduct discovery as to the majority of the facts set forth on those pages, and therefore pursuant to Fed. R. Civ. P. 56(d) (formally Fed. R. Civ. P. 56(f)), requests that the Court allow Citizens further time to determine whether those facts are disputed or not.  "Summary judgment *must* be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hamilton v. Geithner*, 2009 U.S. Dist. LEXIS 49987 (E.D. Va. 2009). "Generally, a district court should decline to grant summary judgment where the non-moving party has not had the opportunity to discover information necessary to oppose summary judgment." *Sutton v. Roth, LLC*, 361 Fed. Appx. 543, 549 (4th Cir. 2010) (reversing trial court's grant of summary judgment where the motion was filed before the court had issued a scheduling order and before the non-moving party had conducted essential discovery).  In keeping with the basic principle summary judgment must not be granted where the nonmoving party has had insufficient time to conduct discovery, the Court should not find that Plaintiff's alleged "undisputed facts" are undisputed just because Citizens has not had adequate time to conduct discovery as to their veracity.

With respect to the Plaintiff's recitation of facts purporting to quote sections of the Citizens Policies, contracts and subcontracts, Citizens admits that the language recited in the Motion is consistent with the language in those documents.

Citizens specifically disputes the alleged fact that "[t]o perform the installation, Porter-Blaine itself used subcontractors." Motion at p. 6. Sam Porter's own testimony, as discussed below, refutes Dragas' assertion that only sub-contractors were used by Porter-Blaine. Citizens intends to take discovery on this issue, and needs more time to complete the discovery.

## Legal Argument

The party seeking summary judgment has the burden of showing the absence of a material fact, and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Fed. R. Civ Proc. 56(a). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotations omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).

Here, Plaintiff has failed to meet its burden of establishing that there is no genuine issue of material fact as to whether the Citizens Policies cover the entire Arbitration Award. In fact, the undisputed facts establish that the Citizens Policies do not cover at least some portion of the Arbitration Award, and for this reason alone, Plaintiff's motion should be denied.

**I.     Dragas' Motion Must Be Denied Because It Has Not Established That It Sustained $4 Million In "Property Damage" Caused By An "Occurrence," Or That Any Of The Alleged Damage For Which It Seeks Coverage Occurred During The Policy Periods Of The Citizens Policies.**

It is well-settled under Virginia law that the insured has the burden "to bring himself within the policy." *Maryland Cas. Co. v. Cole*, 156 Va. 707 (1931); *see also Travco Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 707 (E.D. Va. 2010) (same). Although Dragas recognizes this general proposition, its motion does not "bring Dragas within the policy." In order to meet its threshold burden of proving an entitlement to coverage, Dragas must prove that: the damage for which it seeks coverage qualifies as "property damage" under the policies; the "property damage" was caused by an "occurrence;" and the "property damage" took place during the policy period. Put another way, since Dragas is asking this Court to enter judgment in its favor in the amount of $4 million, Dragas must prove that the developments at issue sustained $4 million in "property damage" caused by an "occurrence," and that all $4 million of "property damage" occurred during the periods that the 2005-2006 and 2006-2007 Citizens Policies were in force. Dragas has not even attempted to make such a showing, and indeed cannot make such a showing.

**A.     Dragas Has Not Established That The Damage Claimed Was Caused By An "Occurrence," And Virginia Law Clearly Holds That The Portion Of Its Claimed Damages That Relate To The Remediation of Chinese Drywall Is Not An "Occurrence."**

The $4.9 million Arbitration Award was entered to compensate Dragas for costs it claims to have incurred to remove and replace defective drywall, as well as the cost to repair other elements of the homes (HVAC coils, wiring, etc.) that were supposedly damaged by the Chinese Drywall. Dragas has not, however, presented this Court with any factual record on which it can determine that Dragas incurred $4 million – the amount it asks this Court to award in its motion

– solely to repair damage to elements of the homes other than the Chinese Drywall.  That omission is critical, and fatal to Dragas' motion, because the law is clear that the repair or replacement of a contractor's defective work is not an "occurrence."

The law that operates as an absolute barrier to the relief requested in Dragas' Motion is well established.  Specifically, in *Stanley Martin Co., Inc. v. Ohio Cas. Group*, 313 Fed. Appx. 609 (4th Cir. Va. 2009), the Fourth Circuit, applying Virginia law, explicitly held that a contractor's defective work is not an "occurrence."  In that case, a subcontractor to the insured general contractor supplied wood trusses for the construction of town homes in a residential development.  *Id.* at 610.  The contract obligating the subcontractor to perform the work contemplated that the subcontractor would indemnify the insured general contractor for defective work.  *Id.*  Homeowners later complained of mold growth in the townhomes and it was determined that the source of mold was the trusses supplied and installed by the subcontractor. *Id.*  The insured sought coverage under its CGL policy for the cost to remediate the mold damage.  *Id.*  The trial court granted summary judgment to the insurer and held that a sub-contractor's defective work did not constitute an "occurrence" because it was foreseeable that a subcontractor would not perform its work in a workmanlike manner.  *Id.* at 611.

On appeal, the Fourth Circuit held that while "damage a subcontractor's defective work causes *to an insured's nondefective work* constitutes an occurrence," the need to repair or replace *the defective work or building component itself* was not an occurrence or accident because the "obligation to repair or replace the defective trusses was not unexpected or unforeseen under the terms of [the] building contracts . . . ."  *Id.* at 614; *see also Builders Mutual Ins. Co. v. Dragas, et al.*, 709 F. Supp. 2d 441, 448 (E.D. Va. 2010) (denying motion to dismiss Dragas' counterclaim for failure to allege an "occurrence" solely because Dragas alleged damage to "nondefective"

12

work).   Dragas does not acknowledge this central holding of *Stanley Martin*, and makes no

attempt in its motion to establish what portion (if any) of the $4.9 million Arbitration Award or

the $4 million it asks this Court to award was for the repair of damage to parts of the

developments caused by the allegedly defective drywall.

The rationale of the rule adopted in *Stanley Martin* is obvious and has been clearly

articulated by courts in Virginia:

> The insurance policy issued to the [renovation contractor] is a
> general liability policy covering accidents causing bodily injury or
> property damage.  **It is not a performance bond.**  It does not
> cover poor workmanship.

*American Fire & Cas. Ins. Co. v. Doverspike*, 36 Va. Cir. 263 (Va. Cir. Ct. 1995) (emphasis

added) (holding that faulty workmanship is not an "accident" under a CGL policy).  The Virginia

Supreme Court agrees that general liability policies are not to be "convert[ed]" into

"performance bond[s]."  *Nationwide Mut. Ins. Co. v. Wenger*, 222 Va. 263 (1981) (finding no

coverage for internal defectiveness of the insured's work based on exclusion in the applicable

policy).  If commercial general liability policies covered contractors for deficiencies in their

work, the contractor would have no incentive to perform the work properly or to select proper

materials in performing the work.

Here, just as in *Stanley Martin*, the subcontracts obligating Porter-Blaine to perform

installation of drywall at the 74 homes at issue anticipate that Porter-Blaine may not perform its

work properly, and provide that Porter-Blaine is responsible for replacing "unsatisfactory"

materials even after acceptance of Porter-Blaine's work:  Porter-Blaine "shall be liable for

correcting all work *and materials*, which produce an unsatisfactory installation."  (*See, e.g.*, Rec.

Doc. 13-1, p. 1, ¶ 9.) (contract obligating Porter-Blaine to perform the work) (emphasis added).

Porter-Blaine and Dragas therefore clearly anticipated that Porter-Blaine might perform

unsatisfactory work, or supply unsatisfactory materials, and agreed that Porter-Blaine would remedy any such deficient work.  Just as in *Stanley Martin*, therefore, Porter-Blaine's defective work was anticipated and contemplated by the parties at the time of contracting, and just as in *Stanley Martin* Porter-Blaine's defective work does not qualify as an "occurrence" under the Citizens Policies.

Under the clear holding of *Stanley Martin*, the Court cannot enter judgment in Dragas' favor for $4 million, because Dragas has not shown what portion of that sum was for the removal and replacement of Chinese Drywall and what sum (if any) was for the repair of other components of the developments that were caused by the Chinese Drywall.

Moreover, although the Court need not reach this issue, it is also important to note that Dragas cannot avoid having to meet its burden of proving what portion of its claimed damages was for the repair of property damaged by the Chinese Drywall, by claiming that it had to remove the drywall in order to repair elements of the homes (*e.g.,* wiring) behind the drywall. As an initial matter, Dragas has not made a showing that it incurred $4 million in costs to remove Chinese Drywall in order to repair components behind the drywall.  *See* J. Malloy Aff. at Exh. A (indicating that Chinese Drywall was removed and replaced in at least some of the units even though homeowners had no complaints of either odor or corrosion).  As a purely factual matter, therefore, this argument is unavailing.  It is also contrary to the law, which holds that damage to non-defective work caused by the repair of defective work is not covered because it does not arise from an "occurrence.  *See OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, No. 06-1563, 242 Fed. Appx. 936 (4th Cir. 2007); *Corn Plus Coop. v. Continental Cas. Co.*, 516 F.3d 674, 680 (8th Cir. 2008) ("losses caused by deliberate repairs are not accidental"); *California Ins. Co. v. Stimson Lumber Co.*, No. 01-514, 2005 WL 627624 at *10 (D. Or. Mar. 17, 2005).

In sum, Dragas has not met its burden of proving that it sustained $4 million in damage as a result of an "occurrence."  For this basic reason, its motion must be denied.

### B.      An Insured Contractor's Defective Work Is Not "Property Damage."

Research indicates no Virginia court has considered the issue of whether a contractor's defective work is considered "property damage" in the context of a general liability policy. However, the majority of courts in other jurisdictions that have considered this issue have concluded, as this Court should, that defective work is not "property damage."  For this additional reason, whatever portion of the $4 million Dragas seeks is for the cost to remove and replace Porter-Blaine's defective work is not covered because that sum is not to remediate "property damage."  The Court therefore cannot enter judgment in Dragas' favor in the amount of $4 million, as Dragas requests in its motion.

"The costs incurred to repair a defective product or defective work do not constitute property damage under a commercial general liability policy."  Couch On Insurance, § 129:6 (3rd ed. 2008).  As recently explained by the Fourth Circuit, the rationale underlying this view is that CGL policies are not meant to be performance bonds:

> the quality of the insured's work is a 'business risk' which is solely within his own control, and . . . liability insurance generally does not provide coverage for claims arising out of the failure of the insured's product or work to meet the quality or specifications for which the insured may be liable as a matter of contract.  Rather, such business risks are the purpose of performance bonds, not liability insurance policies.

*Breezewood of Wilmington Condos. Homeowners' Ass'n v. Amerisure Mut. Ins. Co.*, 335 Fed. Appx. 268, 271-272 (4th Cir. 2009) (internal citations and quotations omitted); *see also* Couch on Insurance, § 129.1 (3rd ed. 2008) (explaining that general commercial liability policies do not cover business risks that "occur as a consequence of the insured not performing well and [are] a component of every business relationship that is necessarily borne by the insured in order to

satisfy its customers").  In *Breezewood*, for example, the insured contractor was sued for defects

in construction and design of a condominium development that necessitated "extraordinary

repairs and reconstruction" and resultant loss of use of the property.  *Breezewood* at 269.  The

Fourth Circuit affirmed the district court's granting of summary judgment to the insurer finding

first that there was no "property damage," and second, there was no "loss of use" of the property

because faulty workmanship that was not covered caused the "loss of use."  *Id*. at 278.

Dragas' motion should be denied because Dragas has not demonstrated, and cannot

demonstrate, that the $4 million it seeks was for "property damage."  The defective drywall itself

does not qualify as "property damage," and the cost to remove and replace that drywall cannot be

recovered under the Citizens Policies.

### C.    Dragas Has Not Established What Portion Of Potentially Covered Damage, If Any, Occurred During The Policy Periods Of The CGL Policies.

Because Dragas has made no attempt to segregate the cost to remove and replace the

Chinese Drywall from the cost to repair any damage caused by the Chinese Drywall, it is not

surprising that in its Motion, Dragas has also failed to establish that any of the damage for which

it now asks this Court to award it $4 million was for damage to property during the 2005-2006

and 2006-2007 Citizens Policy periods.  That omission is fatal to Dragas' Motion.

As noted above, and as Dragas does not dispute, the Citizens policies provide coverage

(subject to additional limitations and exclusions) only for property damage that takes place

during the policy periods.  The two Citizens Policies on which Dragas has moved are the policies

that were in force from November 15, 2005 through November 15, 2006, and from November

15, 2006 through November 15, 2007.[1]  Dragas must, as a threshold burden of establishing a

---

[1] Citizens issued other policies to Dragas for the 2007-2008 and 2008-2009 time frames, which have different policy language than the 2005-2006 and 2006-2007 CGL Policies.  W. Makimoto Aff. at Exhs. C-D.

right to any coverage under the 2005-2006 and 2006-2007 Citizens Policies, prove what amount of damage, if any, took place during the 2005-2006 and 2006-2007 policy periods.

Dragas cannot, and the Court cannot, simply assume that the Chinese Drywall began causing damage to other elements of the homes immediately upon installation. *See, e.g., Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc.*, 778 A.2d 1132 (N.J. App. Div. 2001) ("in the absence of more proofs," the court could not conclude that the defective product began to deteriorate immediately upon installation). That is particularly true here, as Dragas has offered no scientific or expert testimony to establish that proposition.

Moreover, documents produced in parallel litigation, *Builders Mutual Ins. Co. v. Dragas, et al.,* Docket No: 2:09cv185 (E.D. Va.) ("*Builders Mutual v. Dragas* action") indicate that some of the homes that were voluntarily remediated by Dragas sustained *no* damage to components of the home such as copper wiring and pipes, but were simply remediated by Dragas because they contained drywall that was suspected to be defective. J. Malloy Aff. at Exh. A. Those homes certainly did not sustain any "property damage" at all, let alone "property damage" during the relevant time period, and yet Dragas is apparently seeking coverage for sums it incurred to remediate undamaged homes. Additionally, many of the homes at issue received certificates of occupancy after the 2005-2006 policy expired, which suggests that damage to those homes — if there was any — took place after the expiration of the 2005-2006 policy. *See* Kokaska Certification, Exhibit A.

Simply put, on the record before the Court, there is no basis for the Court to conclude that any damage occurred during the policy periods of the Citizens policies, or what portion of the $4

million that Dragas asks this Court to award represents sums incurred to fix damage that took place during the policy periods.  Dragas' motion should therefore be denied.[2]

## II.     The Court Need Not Consider Whether Porter-Blaine's Liability For Damage Caused By Defective Drywall Constitutes One Or Multiple Occurrences.  If The Court Considers This Issue, It Should Conclude That The Damage Arises From A Single Occurrence.

Because Dragas has failed to show that it incurred $4 million in costs to fix damage caused by Porter-Blaine's defective work, and that all of that damage occurred during the two years that the Citizens policies at issue were in force, the Court need not consider at this point whether Porter-Blaine's liability to Dragas arises from one or from multiple occurrences.  If the Court elects to consider this issue, it should find that there is a single occurrence.

The term "occurrence" is defined in the Citizens policies as "an accident, including *continuous or repeated exposure* to *substantially the same general harmful conditions*."  W. Makimoto Aff. at Exhs. A-B, at p. 14-15 of 16, Section V.13 and V.17 (emphasis added). Virginia, like most jurisdictions, follows the "cause" test in determining what constitutes an "occurrence" – that is, the courts look at the "cause" of the injury or damage in determining the number of "occurrences."  *See, e.g., American Cas. Co. of Reading, Pa. v. Heary*, 432 F. Supp. 995, 997 (E.D.Va. 1977).  Where, as here, multiple claims for damage arise from the same common cause, those claims all arise from a single "occurrence."

The "cause" of the damage to each home claimed by Dragas to have sustained damage from defective drywall shares a common thread – the presence of defective drywall purchased from China.  According to Dragas, Porter-Blaine installed the same defective drywall, from the

---

[2] As the Court may be aware, courts apply various theories to determine which of several successive policies are "triggered" by property damage.  Under a "manifestation" trigger, for example, only the policy in force when damage is discovered is triggered, even though some damage may have occurred earlier.  For purposes of this motion, the Court need not decide which "trigger" theory should apply, because Dragas has not established that the full $4 million it seeks to recover was for covered damages that took place during the 2005-2006 and 2006-2007 policy periods.

same Chinese source, in all of the 74 affected homes, which caused the claimed damages in all of the 74 homes.  Motion at 15.  The 74 homes therefore experienced "substantially the same general harmful conditions."  Since the claimed damage for which Dragas seeks recovery from Citizens was all caused by a single, common cause, there can be only one occurrence.

Under similar circumstances, courts in other jurisdictions that apply the "cause test" when determining the number of occurrences have held that multiple claims arising from the distribution of a defective product all arise from a single "occurrence."  In *Owners Ins. Co. v. Salmonsen*, 622 S.E.2d 525, 526 (S.C. 2005), for example, the court held that the distribution of a defective building product material (in that case synthetic stucco known as EIFS) constituted a single "occurrence" even though there were claims from numerous homeowners that had the defective product installed in their homes.  Significantly, the *Salmonsen* court drew a distinction between negligent distribution of a safe product, and non-negligent distribution of a defective product, and held that when the distributor commits "no distinct action giving rise to liability for each sale…placing a defective product into the stream of commerce is one occurrence."  *Salmonsen*, 622 S.E.2d at 526.  In other words, because the "cause" of the damage was "the same general harmful conditions" from the defective product, rather than individual and discrete acts of negligence or non-performance by the distributor, there was only one "occurrence."

Similarly, in *Assoc. Indem. Corp. v. Dow Chemical Co.*, 814 F. Supp. 613 (E.D. Mich. 1993), the court held that multiple claims arising from the failure of polyethylene gas pipe installed over a widespread area and serving multiple users arose from a single "occurrence."  In reaching that conclusion, the court held that:

> If the continuous production and sale of an intrinsically harmful product results in similar kinds of property damage, then all such property damage results from a common occurrence.

*Dow Chem.*, 814 F. Supp. at 622.  The evidence showed that there was only one cause of the damage claimed, the production of defective resin used to manufacture the pipes, and therefore there was "absolutely no basis…to rule that the damage to each [claimant] stemmed from a separate occurrence."  *Dow Chem.*, 814 F. Supp. at 623.  Under *Dow Chemical*, therefore, where a defective product is the proximate and common cause of multiple claims of damage, there is only one "occurrence."  *see also Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 335 (3d Cir. 2005) (affirming district court's finding that multiple asbestos-related claims constitute a single "occurrence").

Dow Chemical* and *Salmonsen* articulate a basic, guiding principal of insurance law that should be applied here to reach the same result reached by those courts.  Where, as is clearly the case here, the damage or injury for which coverage is sought arises from a single cause, there can be only one occurrence.  In this regard, the only "cause" of damage to the 74 residences identified by Dragas is the presence of Chinese-manufactured drywall.  There is no evidence of any other contributing cause or discrete and independent acts of negligence on the part of Porter-Blaine that would support the conclusion that the damage at issue does not arise from "substantially the same general harmful conditions."

Dragas' arguments to the contrary are not persuasive.  Citing *American Cas. Co. v. Heary*, 432 F. Supp. 995 (E.D.Va. 1977), Dragas correctly notes that Virginia courts, like the courts in *Dow Chemical*, *Salmonsen*, and *Treesdale* follow the "cause" test when determining the number of occurrences.  Dragas fails to acknowledge, however, that *Heary* also stands for the proposition that where a single act of negligence causes multiple injuries or damage, all of the injuries and damage are regarded as arising from a single occurrence.  *Id.*  In *Heary*, an insured lost control of her car and set in motion a chain of events that resulted in multiple injuries and

damage. The court found that the claims against the insured constituted a single occurrence because the underlying cause was a "single act of negligence." *Id.* at 997.

Plaintiff's citation to *Jane Doe* for the proposition that the term "occurrence" is ambiguous is similarly misplaced. Motion at 12, citing *S.F. (Jane Doe) v. West Am. Ins. Co.*, 250 Va. 461 (1995). The court in *Jane Doe* found that term ambiguous in the context of multiple claims for negligent hiring, training, retention and supervision of an employee who committed multiple sexual assaults, because there were multiple causes of the multiple assaults. Here, however, there is only one cause of the damage claimed by Dragas – the presence of defective Chinese Drywall. *Jane Doe* does not stand for the sweeping proposition asserted by Dragas.

Moreover, Dragas' argument on this point completely ignores the definition of "occurrence" set forth in the Citizens Policies. Rather, Dragas simply asserts that the term is ambiguous, and from there leaps to the conclusion that because the term is supposedly ambiguous, it must be construed in a way that maximizes coverage for Porter-Blaine. The term "occurrence," when defined as it is in the Citizens policies is not ambiguous, and certainly Dragas has offered no construction of the definition that would give meaning to the phrase "including continuous or repeated exposure to substantially the same general harmful conditions" and still lead to the conclusion that the installation of drywall at each of the 74 residences constitutes a separate "occurrence."

Remarkably, Dragas argues that this Court should find multiple occurrences for Porter-Blaine's installation of drywall in each home despite the fact that it has argued in parallel litigation that there are only two occurrences under Dragas' own general liability policy with Builders Mutual Insurance Company. *See* Aff. of J. Malloy at Ex. B, p. 26 (Dragas' Memorandum of Law In Support of Its Motion for Summary Judgment in *Builders Mutual Ins.*

*Co. v. Dragas*, et al., Docket No:  2:09cv185, Doc. No. 118).  Dragas cannot have it both ways, and the fact that Dragas is asking this Court to let it have it both ways, only serves to underscore that Dragas' entire argument on the "number of occurrences" lacks any basis in the relevant policy language and the facts of this action.

As shown above, there is a single common cause of all of the claimed damage to the 74 homes at issue – the presence of defective drywall.  Under those circumstances, there is only one "occurrence," and the Court should so hold if it elects to consider this issue at this early stage of the litigation.

**III.      Dragas' Contention That The "Your Work" Exclusion Does Not Apply Is Based On An Erroneous Characterization Of The Record.  Summary Judgment Should Be Denied Because Dragas Has Not Established That The Sub-Contractor Exception To That Exclusion Applies.**

Dragas also seeks summary judgment on the applicability of the "your work" exclusion, which provides as follows:

> This insurance does not apply to:
>
> * * *
>
> (l)      "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

*See, e.g.,* W. Makimoto Aff. at Exhs. A-D, Form No. CB 00 01 10 01, at p. 5.  Dragas contends that this exclusion does not apply because Sam Porter of Porter-Blaine supposedly testified that "Porter-Blaine itself used sub-contractors to install the Chinese drywall," and the sub-contractor exception to the exclusion therefore applies.  Motion at 16.  Porter did not, however, testify as

claimed by Dragas.  Rather, Porter testified that Porter-Blaine used its own employees *and* sub-contractors on the Dragas developments:

> Q: And when Porter-Blaine did a job, was it always – installing drywall – was it always with a hundred percent Porter-Blaine employees or would you also subcontract laborers to assist to do a portion of the work?
>
> A:  What we did, we used what was called a second-tier sub which is – there's many different subcontractors that offer their services to different contractors, the general public, Some of them just install board, some of them install board and finish, some of them just finish, some of them just texture, some that may sand and some that do all the above.
>
> Q:  *So in addition to your hundred or so employees, Porter-Blaine Corporation would hire these second-tier subs to perform various degrees of the installation work; it that correct*?
>
> A: *That's correct*.

Pl's Motion at Ex. 1 (Rec. Doc. 12-1), p. 846-47 (emphasis added).)  This testimony speaks for itself:  Dragas did not use only subcontractors to install drywall, and the Court therefore cannot conclude that the sub-contractor exception to the exclusion applies.

Moreover, Porter's testimony was very general, and Dragas has proffered no testimony concerning Porter-Blaine's use of subcontractors on the seventy-four individual units that are the subject of this suit.  There are no statements, one way or the other, that would suggest that Porter-Blaine did or did not follow its apparent general practice of using subcontractors for some of the work performed on the seventy-four units in question.  In fact, if this statement is taken as uncontroverted fact, then it would only prove that some percentage of the seventy-four units are in fact barred from coverage under the "Your Work" exclusion.

Further, at most, this testimony suggests that subcontractors may have installed drywall in only some of the seventy-four units in question.  The identification of which units and how many units may be affected is a vital fact to any potential measure of damages.  At the very least,

discovery is required to determine whether Porter-Blaine in fact used subcontractors to install drywall in the seventy-four units in question and, if so, then how many and which units.[3]

In short, Dragas' perfunctory and conclusory argument that no genuine issue of material fact exists with respect to whether the "your work" exclusion applies is demonstrably incorrect. At the very least, Citizens should be permitted to take discovery to determine whether Porter-Blaine in fact used subcontractors to install drywall in the seventy-four units in question and, if so, then how many and which units. These facts are of critical importance in determining whether the "your work" exclusion applies and, if so, to what extent. At this stage in this matter, these vital facts have not yet been ascertained since discovery has not yet begun and these factual issues were not resolved in the underlying arbitration. For these reasons, pursuant to Federal Rule of Civil Procedure 56(d), Dragas' motion for partial summary judgment must be denied or continued until such time as these facts may be conclusively established.

**IV.    The Faulty Workmanship Exclusion Bars Coverage.**

Even if the Court finds that Plaintiff has established that all of the damages sought under the Arbitration Award constitute an "occurrence" and "property damage," the Citizens Policies exclude coverage for "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. W. Makimoto Aff. at Exh. A-B, Form No. CG 00 01 10 01, at pp. 4-5. ("j(6) exclusion".) Consistent with other Virginia courts that have addressed this exclusion in similar factual scenarios, this exclusion bars coverage for the cost to remove and replace the defective drywall.

---

[3] Here again, Dragas also argues that "repair and replacement of the drywall itself should be covered because it was necessary to prevent further damage to other building components and the homeowners' personal property." Motion at 16. This bald assertion is supported only by a cite to an insurance treatise. There is no support for the factual contention that the blanket replacement of drywall installed by Porter-Blaine was necessary to prevent further damage. In fact, the parties are aware that in at least some instances, drywall was replaced without any actual claim by the homeowner that there was any damage to electrical or plumbing equipment or any odor. J. Malloy Aff. at Exh. A.

In *Pulte Home Corp. v. Fid. & Guar. Ins. Co.*, 80 Va. Cir. 160 (Va. Cir. Ct. 2004), for example, the builder of a number of homes with defective EIFS (along with an additional insured on a policy issued to the EIFS subcontractor) sought coverage for the cost of tearing-out and replacing the defective EIFS.  Noting that the Virginia Supreme Court had "declined prior invitations to convert an otherwise unambiguous CGL policy into a performance bond," the court in *Pulte* held that the policy, which contained language identical to the j(6) exclusion present in this case, excluded coverage for the cost to repair or replace the named insured's defective work.

Similarly, in *Nationwide Mutual Ins. Co. v. Wenger*, 222 Va. 263 (1981), the Virginia Supreme Court held that an exclusion similar to the j(6) exclusion in the Citizens policies in question barred coverage for the collapse of poultry houses built by the insured.  The exclusion at issue in *Wenger* excluded coverage for "property damage to work performed by or on behalf of the named Insured and arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." *Wenger*, 222 Va. at 265.  The insurer argued that the exclusion applied because the insured's "work" was building the poultry houses; the insured argued that the exclusion did not apply because it had completed its work and the loss was therefore covered under the "products-completed operations" coverage part.  The court rejected the insured's argument, holding that:

> When considered in context, the word "work" should be read as a noun, referring back to, and having the same meaning as, the phrase "work performed."  The section should thus operate to withdraw coverage for damage to the insured's work product resulting from an inherent defect, even though construction is completed and the contractor has relinquished control.  This interpretation is consistent with the construction accorded similar exclusion clauses in numerous other cases.

*Wenger*, 222 Va. at 268, citing *Southwest Forest Industries, Inc. v. Pole Buildings, Inc.*, 478 f.2d 185 (9th Cir. 1973); *see also Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (1979)

(cited as a leading case on "business risks" exclusions, and holding that such exclusions bar coverage for claims involving the repair and replacement of defective work).

In this case, it is uncontested that (1) the Arbitrator found that the drywall at issue was defective, (2) the drywall was material furnished by the insured in connection with the insured's work, and (3) the Arbitration Award includes damages for replacing the drywall.  Since the foregoing exclusion bars coverage for the cost to remove and replace defective drywall, and Dragas has not stated what portion of the $4 million it seeks was for that excluded category of costs, the Court cannot enter judgment in Dragas' favor.

**V.      Additional Exclusions May Bar Or Limit Coverage, But Citizens Needs Additional Discovery In Order To Make That Determination.**

Pursuant to Fed. R. Civ. P. 56(d), if a non-movant shows that it "cannot present facts essential to justify its opposition, the court may" defer the motion, deny the motion, or issue any other appropriate order.  Fed. R. Civ. P. 56(d).  "Summary judgment *must* be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hamilton v. Geithner*, 2009 U.S. Dist. LEXIS 49987 (E.D. Va. 2009).  "Generally, a district court should decline to grant summary judgment where the non-moving party has not had the opportunity to discover information necessary to oppose summary judgment."  *Sutton v. Roth, LLC*, 361 Fed. Appx. 543, 549 (4th Cir. 2010) (reversing trial court's grant of summary judgment where the motion was filed before the court had issued a scheduling order and before the non-moving party had conducted essential discovery).

Plaintiff filed this action in early November 2010, and filed its motion for summary judgment less than two months later, before the parties have even conducted a Rule 16

conference.  Plaintiff is mistaken that because Dragas and Citizens are litigating a parallel action in *Builders Mutual v. Dragas*, Citizens should have had ample time to determine the factual issues necessary to litigate this action.  Discovery in that parallel action is ongoing; it has not been completed.  As set forth in the Affidavit of John Malloy, there are factual issues in dispute that are (1) the subject of upcoming depositions pursuant to Rule 30(b)(6); and (2) there is outstanding written discovery directed at the issues raised in the motion.  *See* J. Malloy Aff. at ¶¶ 5-8.  As such, the Court should either defer consideration of Plaintiff's Motion until the discovery that Citizens needs to perform is completed, or deny the Motion.

The additional exclusions that may bar or limit coverage are as follows.[4]

### A.    The "Performing Operations" Exclusion May Apply

The Citizens Policies contain the following exclusion:

> This insurance does not apply to:
>
> * * *
>
> "Property damage" to:
>
> * * *
>
> (5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations…"

*See, e.g.*, W. Makimoto Aff. at Exh. A, Form No. GG 00 01 10 01, at p. 4 (emphasis added).

At this point in this matter, it is not possible to determine whether this exclusion bars or limits coverage.  If Dragas contends that the alleged damage at issue was initially sustained during installation of the drywall in question, this exclusion would apply.  Citizens has served written discovery on Dragas asking it to state when the claimed damage began, and the factual basis for

---

[4] By identifying certain additional exclusions here, Citizens does not waive its rights to rely upon additional exclusions.

that assertion.  Dragas' responses to that discovery are not yet due.  The time at which damage

allegedly occurred will also be the subject of Rule 30(b)(6) deposition testimony.  Once all of the

facts are known and Dragas has stated a position on when the damage occurred, the foregoing

exclusion may apply.  *See, e.g.*, *Credit General Ins. Co. v. Abateco Services, Inc.*, 11 Fed. Appx.

47 (4th Cir. 2001), (exclusion applies to property damage that takes place while the insured is

actively performing operations).  For this reason, pursuant to Federal Rule of Civil Procedure

56(d), Dragas' motion for partial summary judgment must be denied or continued until such time

as these facts may be conclusively established.

> ### B.   The "Impaired Property" Exclusion May Apply

The CGL Policies contain the following exclusion:

> This insurance does not apply to:
>
> * * *
>
> m.  Damage to Impaired Property or Property Not Physically
>      Injured
>
>      "Property damage" to "impaired property" or property that has
>      not been physically injured, arising out of:
>
>      (1)  A defect, deficiency, inadequacy or dangerous condition
>            in "your product" or "your work"; or
>
>      (2)  A delay or failure by you or anyone acting on your behalf
>            to perform a contract or agreement in accordance with its
>            terms.
>
>      This exclusion does not apply to the loss of use of other
>      property arising out of sudden and accidental physical injury to
>      "your product" or "your work" after it has been put to its
>      intended use.

See, e.g., Form No. CG 00 01 12 04, p. 5.

The concept of impaired property can best be illustrated by an example.  In *St. Paul Fire*

*& Marine Ins. Co. v. Bergquist Co.*, 28 Pa. D. & C.4th 141, 143 (Pa. Common Pleas Ct. 1996), a

manufacturer of rubberized tape sold the tape to a company that manufactured water coolers. When the tape was placed in the water coolers, it caused the coolers to "smell like rotting fish" and emit an odor strong enough "to clear a building." *Id.* The court held that there was "no doubt" the water coolers were impaired property within the meaning of the impaired property exclusion because they were "tangible property, other than [the insured's] products or completed work, that were only able to be restored to use by the replacement or removal of the [insured's] product [(the tape)] that formed a part of the coolers." *Id.* at 148.

In the example above, if the tape not only smelled, but also caused the water cooler itself to somehow dissolve, then the water cooler would be "physically injured" and the impaired property exclusion would not apply. Here, however, as discussed above, the parties are aware that in at least some instances, drywall was replaced without any actual claim by the homeowner that there was any damage to electrical or plumbing equipment or any other property. J. Malloy Aff. at Exh. A. The impaired property exclusion operates to bar coverage in these circumstances. Therefore, these facts must be confirmed and the units that fall into this category must be identified. These facts are of critical importance to determining whether the "impaired property" exclusion applies and, if so, to what extent. At this stage in this litigation, these vital facts have not yet been ascertained since no discovery has yet commenced and these factual issues were not resolved in the underlying arbitration. For these reasons, pursuant to Federal Rule of Civil Procedure 56(d), the insured's motion for partial summary judgment must be denied or continued until such time, if ever, as these facts may be conclusively established.

### Conclusion

For the foregoing reasons, The Hanover Insurance Company and Citizens Insurance Company of America respectfully request that the Court find that Dragas has not met its burden

of proving that it is entitled as a matter of law to recover from Citizens $4 million out of its

undifferentiated $4.9 million arbitration award, and deny Dragas' motion.

Dated:  January 14, 2011                    Respectfully submitted,


                                                 /s/
                                _____
Thomas S. Garrett
VSB No.  73790
Counsel for Hanover Insurance Company
and Citizen's Insurance Company of America
Harman, Claytor, Corrigan & Wellman, P.C.
P.O. Box 70280
Richmond, Virginia  23255
Phone: 804-747-5200
Fax: 804-747-6085
tgarrett@hccw.com

and

John P. Malloy
(*pro hac vice* application pending)
Counsel for Hanover Insurance Company
and Citizen's Insurance Company of America
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Phone:  860-275-8200
Fax:  860-275-8299
jmalloy@rc.com

## <u>CERTIFICATE</u>

      I certify that on this 14th day of January 2011, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

W. Edgar Spivey, Esq.
Kristan B. Burch, Esq.
R. Johan Conrod, Jr., Esq.
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
*Counsel for Plaintiff Dragas Management Corporation*


                                          /s/
                                Thomas S. Garrett
                                VSB No.  73790
                                Counsel for Hanover Insurance Company
                                and Citizen's Insurance Company of America
                                Harman, Claytor, Corrigan & Wellman, P.C.
                                P.O. Box 70280
                                Richmond, Virginia  23255
                                Phone: 804-747-5200
                                Fax: 804-747-6085
                                tgarrett@hccw.com