UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| DRAGAS MANAGEMENT CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 2:10-cv-547 |
| v. | : | |
| | : | **REDACTED – SEE FILING UNDER** |
| | : | **SEAL FOR COMPLETE VERSION** |
| THE HANOVER INSURANCE COMPANY, | : | |
| | : | |
| and | : | |
| | : | |
| CITIZENS INSURANCE COMPANY | : | |
| OF AMERICA, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS CITIZENS INSURANCE COMPANY OF AMERICA AND
HANOVER INSURANCE COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

This insurance coverage action arises out of the installation of Chinese-manufactured

Drywall ("Chinese Drywall") by Porter-Blaine Corporation ("Porter-Blaine") in two housing

developments constructed by Dragas Management Corporation or one of its affiliates ("DMC").

DMC determined that the Chinese Drywall installed in 74 of those homes was defective, because

it released reduced-sulfur compounds, which damaged other elements of the affected homes

(*e.g.*, copper wiring and pipes).  DMC obtained an arbitration award against Porter-Blaine,

Hanover's and Citizens' insured, in the amount of $4.9 million for the replacement of the

defective drywall and the repair of property damaged by that defective drywall.  DMC seeks in

this action to recover that sum from Citizens and Hanover.

As the Court is aware, DMC previously filed a motion for partial summary judgment,

seeking a ruling from this Court that DMC is entitled as a matter of law to recover at least $4

million of the $4.9 million judgment it obtained against Porter-Blaine, because two of the policies issued by Citizens to Porter-Blaine do not contain an applicable limitation or exclusion that would bar coverage.  As demonstrated in Citizens' brief in opposition to DMC's motion (Rec. Doc. 20), DMC's motion should be denied because, among other things, DMC has not presented this Court with sufficient evidence from which the Court can conclude that DMC is entitled to recover $4 million under the two Citizens policies that are the subject of that motion.

In contrast, however, the Court can and should conclude that the remaining Citizens policies and all of the Hanover policies exclude coverage by virtue of the "Total Pollution Exclusion" contained in those policies.  In this motion, therefore, Citizens and Hanover seek partial summary judgment, dismissing any claims under the Citizens and Hanover Policies that contain the Total Pollution Exclusion.

## Statement of Undisputed Material Facts

Pursuant to Local Rule 56(B), Citizens and Hanover respectfully submit that the following material facts are undisputed for purposes of their Motions for Partial Summary Judgment:

**A.     The Citizens and Hanover Policies Provide For Coverage Only When The Insured Becomes Legally Obligated To Pay For Property Damage _To Which The Insurance Policies Provide Coverage_.**

1.     Subject to their terms, conditions, limitations and exclusions, the Citizens Policies provide primary insurance.  The insuring agreement in all of the Citizens Policies states that Citizens will pay:

> those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' _to which this insurance applies_.

Ex. 1, Jan. 13, 2011 W. Makimoto Aff. at Exhs. A-B, at p. 1, Section I.1.a (emphasis added); Ex. 2, Jan. 27, 2011 W. Makimoto Aff. at Exhs. A-B at p. 1, Section I.1a (emphasis added).

2.      Subject to their terms, conditions, limitations and exclusions, the Hanover Policies provide excess coverage upon exhaustion of the underlying Citizens Policies.  The Hanover Policies state that Hanover will pay "those sums in excess of the underlying insurance that any insured becomes legally obligated to pay" "as damages because of . . . property damages . . . covered by this insurance which takes place during the policy period of this policy and is caused by an occurrence."  *See* Ex. 2, Jan. 27, 2011 W. Makimoto Aff. at Exhs. C-F at p. 3, Section I and II.

**B.      Chinese Drywall Emits Pollutants In Homes Where The Insured, Porter-Blaine, Installed The Drywall.**

3.      Chinese Drywall was installed in 74 homes (the "Homes") built by DMC in two condominium developments – The Hampshires at Greenbrier ("The Hampshires") and Cromwell Park at Salem ("Cromwell Park").  (Declaration of Brian D. Kokoska ("Kokoska Decl."), attached as Exhibit 3, ¶ 16).

4.      The Chinese Drywall was installed in the Homes by DMC Porter-Blaine. (Kokoska Decl. (Ex. 3), ¶ 16).  A chart listing the 74 affected Homes by project, address, and the date on which each Home received its Certificate of Occupancy is attached as Exhibit A to the Kokoska Declaration.

5.      The Chinese Drywall installed in the Homes was manufactured by Taishan Gypsum, and is "the same drywall installed" in the home of another homeowner in Virginia (otherwise unrelated to the Homes here), Larry Ward.  (Declaration of Kristan B. Burch ("Burch

Decl.") (attached as Exhibit 4), ¶ 12).[1]  Mr. Ward was involved in another insurance coverage declaratory judgment action before this Court – *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010).

6.     Some of the Homeowners complained to DMC of a foul smell in their Homes (Kokoska Decl. (Ex. 3), ¶ 3), and the Homes had experienced a higher-than-normal incidence of HVAC coil failures. (Kokoska Decl. (Ex. 3), ¶¶ 4, 9-11, 19-20).

7.     Some Homeowners living in the Homes experienced tarnishing of precious metals; air conditioning coil failures; shortages in light switches; metal and copper on light switches, outlets, and elsewhere in homes turning black; and offensive sulfur odors.  (Declaration of Helen E. Dragas ("Dragas Decl.")) (attached as Ex. 5), ¶¶ 24-26).

8.     Some Homeowners complained of health problems such as headaches, rashes, watery eyes, sinus congestion, apnea, coughing, sore throats, and fatigue. (Dragas Decl. (Ex. 5), ¶ 29).

9.     DMC conducted its own testing in an attempt to verify the information about the effects of Chinese Drywall being reported in the news and alleged in various lawsuits.  (Kokoska Decl. (Ex. 3), ¶ 13).

---

[1] Larry Ward is a plaintiff in a case filed by Attorney Serpe, who is referenced by Ms. Burch in her Declaration.  According to ¶ 12 of the Burch Declaration, "Serpe is also counsel for a number of homeowners who are among the at least sixty-five (65) different cases currently pending in the Circuit Court for the City of Norfolk involving Chinese Drywall.  Each of the cases filed by Serpe names builder/developers as defendants.  In addition, each of the cases filed by Serpe involves Chinese Drywall manufactured by Taishan Gypsum, the manufacturer of the Chinese Drywall installed in The Hampshires and Cromwell Park.  **The Chinese Drywall at issue in all these cases is the same drywall as the drywall installed at The Hampshires and Cromwell Park.**"  (emphasis added).  Attached as Exhibit A to T. Garrett's Declaration is Mr. Ward's Complaint against his builder filed in the Circuit Court for the City of Norfolk indicating that Serpe is Mr. Ward's attorney.

10.     DMC's testing confirmed DMC's suspicion that Chinese Drywall had damaged and was continuing to damage other building components of some of the Homes and personal property in some of the Homes.  In particular, testing commissioned by DMC showed corrosive impact on electrical wiring ends at electrical outlets and switches as well as corrosive pitting (i.e, developing holes) of copper gas lines in some of the Homes.  (Kokoska Decl. (Ex. 3), ¶¶ 13-14).

11.     DMC's testing showed that Chinese Drywall had damaged portions of copper wiring and other metal circuitry in the Homes, and had damaged copper gas lines in the Homes, causing the copper lines to "pit."  (Dragas Decl. (Ex. 5), ¶¶ 18, 21).

12.     As compared to homes that were determined not to have Chinese Drywall, the Homes with Chinese Drywall had visible and distinctive corrosion tarnish on electrical wiring, copper tubing of HVAC coils, and copper gas lines.  (Kokoska Decl. (Ex. 3), ¶¶ 15-20).

13.     In addition, analysis of HVAC service records for the Homes revealed that at least twenty-eight (28) of the seventy-four (74) Homes had experienced an HVAC coil failure, requiring replacement, some Homes as many as three times.  This represented a failure rate of over thirty-seven percent (37%).  (Kokoska Decl. (Ex. 3), ¶ 19).  In contrast, over the same time period, only two of two hundred thirty-six (236) homes built by DMC that did not have Chinese Drywall had experienced a coil failure, or less than one percent.  (Kokoska Decl. (Ex. 3), ¶¶ 20).

14.     In February and March 2009, DMC had four laboratory evaluations completed with the goal of determining if Chinese Drywall was the cause of these problems.  Drywall samples from homes in The Hampshires and Cromwell Park with domestic manufactured as well as Homes with Chinese Drywall were evaluated under controlled laboratory conditions.  It was found that air in chambers containing samples of Chinese Drywall had higher concentrations of

reduced sulfur compounds as compared to air in chambers that contained domestic drywall samples.  (Davis Report (Ex. 8), p. 3.) [**REDACTED**]

15.     Laboratory tests commissioned by DMC showed that the concentration of elemental sulfur in the Chinese Drywall in the Homes was, at a minimum, 375 times greater than that of representative samples of domestic-manufactured drywall.  (Davis Report (Ex. 8), p. 2.)

16.     Dragas supplied a lab with electrical wiring and copper tubing samples taken from distinct areas of the initial Home that had submitted complaints.  These items were taken from areas in the Home that had been confirmed to have only domestic drywall nearby and from areas that had been confirmed to have only Chinese Drywall nearby.  The lab reported black corrosion deposits and pitting corrosion on those items taken from areas nearby Chinese Drywall, but neither of these on the same types of items located nearby domestic drywall.  After analysis, that lab also reported the black corrosion deposits observed consisted primarily of copper and sulfur. (Davis Report (Ex. 8), pp. 3, 6.)

17.     DMC hired Columbia Analytical Services, Inc. ("CAS") to perform various analytical studies of the Chinese Drywall in The Hampshires and Cromwell Park.  (Davis Report (Ex. 8), p. 6.)  CAS's testing showed that hydrogen sulfide, carbon disulfide, and carbonyl sulfide were all detected in the air exposed to the Chinese Drywall samples, but these reduced sulfur compounds were not found or were below detection limits in the air exposed to the domestic drywall samples.  (Davis Report (Ex. 8), p. 6.)

18.     Reduced sulfur gases, such as hydrogen sulfide, carbon sulfide, and carbonyl sulfide, released from the Chinese Drywall in the Homes, caused the bad smells, corrosion, pitting, and coil failures in the Homes.  (Davis Report (Ex. 8), p. 2); (Apr. 27, 2010 Deposition of Gerald O. Davis, P.E., in *Dragas Management Corporation v. The Porter-Blaine*

*Corporation*, AAA Arbitration Case No,: 16110Y0043809 (the "Davis Dep."), attached as p. 42, lines 19-22; p. 43, lines 4-7; p. 31, lines 2-11; p. 34, lines 13-15; 42-43; 83-84; p. 45, line 23 – p. 46, line 2; p. 83, lines 18-22).  **[REDACTED]**  The Chinese Drywall in the Homes off-gassed reduced sulfur gases which caused the odor, corrosion, pitting, coil failures, and other property damage within the Remediation Costs.  (Davis Dep. (Ex. 7), p. 43, lines 4-7).  **[REDACTED]**

19.  DMC admitted in parallel litigation that the Chinese Drywall in some of the Homes emitted hydrogen sulfide, carbon disulfide, and/or carbonyl sulfide, which caused tarnishing, and electronics failures.  *See* Declaration of Thomas S. Garrett ("Garrett Decl.") at Exh. B (DMC's Responses to Requests for Admission in *Builders Mutual Ins. Co. v. Dragas Management Corp.* Docket No.:  2:09-cv-185 (E.D. Va.) at ¶¶ 1-6, 10, 16, 17, 28.)

> **C.     DMC Was Awarded $4.9 Million In Damages Against Porter-Blaine In An Arbitration Decision Where It Was Determined That Chinese Drywall Installed By Porter-Blaine Caused Offensive Odors And Corrosion In Some Of The Homes.**

20.     DMC filed an arbitration claim against Porter-Blaine seeking reimbursement of the costs DMC incurred in remediating homes with Chinese drywall, styled *Dragas Management Corporation v. The Porter-Blaine Corporation*, AAA Arbitration Case No.:  16110Y0043809 (the "Arbitration").  (Burch Decl. (Ex. 4), Exhibit K).  The arbitrator concluded that the damage at issue, such as the corrosion found on the HVAC coils, electrical wiring and copper gas lines in the seventy-four affected Homes, was caused by the Chinese drywall in the Homes.  (Burch Decl. (Ex. 4), Exhibit K).

21.     The arbitrator awarded DMC $4.9 million against Porter-Blaine ("Arbitration Award") for the costs of remediation ("Remediation Costs") that DMC incurred in remediating the Homes, which included removing and replacing drywall and remediating, among other

things, HVAC coils, electrical wiring, and copper gas lines.  DMC's Memorandum of Law In

Support Of Its Motion For Partial Summary Judgment (Rec. Doc. 12) at 7.

21.     DMC filed this lawsuit against Hanover and Citizens seeking to recover the entire

$4,933,439.90 Arbitration Award, which Dragas converted to a final judgment in Virginia Beach

Circuit Court.  *See* Rec. Doc. 1 at "Prayer for Relief."

22.     The Arbitration between DMC and Porter-Blaine did not involve any insurance

coverage issues.

**D.      The 2007-2008, and 2008-2009 Citizens Policies and all of the Hanover Excess
          Policies Bar Coverage For the Damages Caused By Chinese Drywall Under
          The Total Pollution Exclusion.**

23.     Citizens issued to Porter-Blaine commercial general liability policy number ZBR

7905525 02 for the policy period of November 15, 2005 to November 15, 2006 (the "2005-2006

Citizens Policy").  Citizens issued renewal commercial general liability policies to Porter-Blaine

for the policy periods of November 15, 2006 to November 15, 2007 (the "2006-2007 Citizens

Policy"),  November 15, 2007 to November 15, 2008 (the "2007-2008 Citizens Policy"), and

November 15, 2008 to November 15, 2009 (the "2008-2009 Citizens Policy").  The 2007-2008

and 2008-2009 Citizens Policies are attached to Exh. 2 (Jan. 27, 2011 Affidavit of W. Makimoto

at Exhs. A-B).

24.     Hanover issued to Porter-Blaine commercial policy number UHR 7917898-01 for

the policy period of November 15, 2005 to November 15, 2006 (the "2005-2006 Excess

Policy").  Hanover issued renewal commercial excess policies to Porter-Blaine for the policy

periods of November 15, 2006 to November 15, 2007 (the "2006-2007 Excess Policy"),

November 15, 2007 to November 15, 2008 (the "2007-2008 Excess Policy"), and November 15,

2008 to November 15, 2009 (the "2008-2009 Excess Policy").  These policies are attached to

Exh. 2 (Jan. 27, 2011 W. Makimoto Affidavit at Tabs C-F).

      25.     The 2007-2008 and 2008-2009 Citizens Policies each contain the following

"Total Pollution Exclusion Endorsement:"

> Exclusion f. under Paragraph 2., Exclusions of Section I –
> Coverage A – Bodily Injury and Property Damage Liability is
> replaced by the following:
>
> This insurance does not apply to:
>
> f.   Pollution
>
>     (1)   "Bodily injury" or "property damage" which would not
>           have occurred in whole or part but for the actual, alleged
>           or threatened discharge, dispersal, seepage, migration,
>           release or escape of "pollutants" at any time.
>
>     (2)   Any loss, cost or expense arising out of any:
>
>         (a)   Request, demand, order or statutory or regulatory
>              requirement that any insured or others test for,
>              monitor, clean up, remove, contain, treat, detoxify or
>              neutralize, or in any way respond to, or assess the
>              effects of "pollutants"; or
>
>                     * * *

*See* Jan. 27, 2011 W. Makimoto Aff. at Exhs. A and B, Total Pollution Excl. (form no. CG 21 49

09 00).  Each of these policies defines "pollutants" as follows:

> "Pollutants" mean any solid, liquid, gaseous or thermal irritant or
> contaminant, including smoke, vapor, soot, fumes, acids, alkalis,
> chemicals and waste.  Waste includes materials to be recycled,
> reconditioned or reclaimed.

*See id.*, Commercial General Liability Coverage Form (Form CG 00 01 10 01 at 15 of 16).

      26.     The 2005-2006 Excess Policy contains the following "Total Pollution Exclusion":

> This policy does not apply to:

    A.  Any liability or expense arising out of or contributed to in any way by the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or existence of **pollutants** at any time in any location.

    B.  Any loss, cost or expense arising out of any:

        1.  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

        2.  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or assess the effects of **pollutants**.

*See* Jan. 27, 2011 W. Makimoto Aff. at Exh. C, Umbrella Liability – Total Pollution Exclusion

(Form No. 472-0238 05/04).   This policy defines "pollutants" as follows:

> **Pollutants** means any solid, liquid, gaseous or thermal irritant or containment, including  but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, radioactive materials, hazardous biological agents or waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

*See id.*, Excella – Excess/Umbrella Policy (Form No. 472-0001 (9/98) at 11.)

    27.    The 2006-2007 Excess Policy, the 2007-2008 Excess Policy and the 2008-2009 Excess Policy each contain the following "Total Pollution Exclusion Endorsement":

Exclusion I. under Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

    i.    Pollution

        (1)    "Bodily Injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2)    "Pollution cost or expense".

*See* Jan. 27, 2011 W. Makimoto Aff. at Tabs D-F, Total Pollution Exclusion Endorsement (Form

No. CU 21 25 12 01).  These policies each also contain the following definitions:

15.    "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

16.    "Pollution cost or expense" means any loss, cost or expense arising out of any:

a.    Request, demand, order or statutory or regulatory requirement  that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

b.    Claim or suit by or on behalf of any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

*See id.*, Commercial Liability Umbrella Coverage Form (Form No. CU 00 01 12 01 at 14 of 16).

## **LEGAL ARGUMENT**

**A.    APPLICABLE LEGAL STANDARDS**

Summary judgment is appropriate where there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(2); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The relevant facts here are undisputed and in fact are

established by DMC's own admissions and the report of its own retained expert, Gerald Davis,

all of which Citizens and Hanover accept as true for purposes of this motion.  This motion for

summary judgment simply requires the Court to apply the undisputed facts to the terms of the

Policies.  A motion for summary judgment calling for the interpretation of an insurance policy is proper "because the construction of insurance contracts is a legal question well suited for resolution by the court."  *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 157 (E.D. Va. 1993) (Ellis, J.) (citing *John Deere Ins. Co. v. Shamrock Indus., Inc.*, 929 F.2d 413, 417 (8th Cir. 1991)).

Under Virginia law, insurance policies are "contracts whose terms are construed in accordance with the general principles applicable to all contracts."  *Dairyland Ins. Co. v. Douthat*, 449 S.E.2d 799, 801 (Va. 1994).[2]  "[W]hen the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written."  *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530 S.E.2d 154, 160 (Va. 2000).  The policy should be read "as a single document, the meaning of which is gathered from all its associated parts when assembled as the unitary expression of the agreement of the parties."  *First Am. Title Ins Co. v. Seaboard Sav. & Loan Ass'n*, 315 S.E.2d 842, 845 (Va. 1984).  Applying those fundamental principles of contract construction to the policies at issue, it is clear that Hanover and Citizens are entitled to partial summary judgment, declaring that policies containing the "Total Pollution Exclusion" do not provide coverage for the judgment DMC obtained against Porter-Blaine.

---

[2] There is no dispute that Virginia law governs the interpretation of the Hanover and Citizens policies.  "A federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits."  *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). "Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured."  *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004); *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993).  Here, the parties agree that Virginia law applies.

**B.    THE TOTAL POLLUTION EXCLUSION IN THE 2007-2008 AND 2008-2009 CITIZENS POLICIES AND ALL OF THE HANOVER POLICIES EXCLUDE COVERAGE FOR THE DAMAGES ALLEGED.**

It is undisputed that the 2007-2008 and 2008-2009 Citizens Policies, and all of the excess policies issued by Hanover contain a Total Pollution Exclusion that undeniably excludes coverage for DMC's claims.  Indeed, DMC essentially concedes this point by limiting its motion for partial summary judgment in this action (Rec. Doc. 12), to the two policies that do not contain a Total Pollution Exclusion.  DMC states that it is limiting its motion for summary judgment to the 2005-2006 Citizens Policy and the 2006-2007 Citizens Policy because "neither of these Hanover [sic][3] Policies contains the 'Total Pollution Exclusion' endorsement that is contained in other Hanover [sic] policies applicable to later years and to excess layers of coverage."  (Rec. Doc. 12 at p. 2-3.)

Virginia courts have repeatedly and consistently held that pollution exclusions, such as the ones at issue here, are valid and enforceable.  *See City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 271 Va. 574 (2006) (holding pollution exclusion in general liability policy barred coverage for alleged bodily injury due to the consumption of toxic drinking water); *Travco Insurance Company v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010) (holding pollution exclusion in first-party property insurance policy barred coverage for property damage arising from Chinese Drywall); *Firemen's Insurance Company of Washington, D.C. v. Kline*, 474 F. Supp. 2d 779 (E.D. Va. 2007) (holding total pollution exclusion in commercial general liability policy barred coverage for injury to warehouse employee from the release of epoxy fumes).  Moreover, in Virginia, the application of the pollution exclusion is not limited to traditional environmental pollution.

---

[3] DMC mistakenly refers to the Citizens Policies as Hanover Policies.

In *Ward*, for example, the United States District Court for the District of Eastern District of Virginia (Doumar, J.), stated as follows:

> Under Virginia law, pollutant exclusions are not limited to "traditional environmental pollution."  Although *City of Chesapeake* did happen to involve traditional pollutants, the Virginia Supreme Court stated its holding in a simple syllogism:  Because the harm was caused by the release of a pollutant, the pollutant exclusion applied.  This is consistent with basic principles of Virginia insurance law, which has long taken the position that "no court can 'insert by construction, for the benefit of a party, a term not express in the contract." *Baldwin v. Baldwin*, 44 Va. App. 93, 603 S.E.2d 172, 176 (Va. 2004)(quoting *Am. Spirit Ins. Co. v. Owens*, 261 Va. 270, 541 S.E.2d 553, 555 (Va. 2001)).

*Ward*, 715 F. Supp. 2d at 717; *see also Kline*, 474 F. Supp. 2d at 796-99 (holding that under Virginia law pollution exclusions are not limited to "traditional" environmental pollution).

Moreover, in *Ward*, the court expressly held that pollution exclusions, such as those at issue here, bar recovery for damages arising from Chinese Drywall.  Similar to the Total Pollution Exclusions at issue here, the first-party property insurance policy at issue in *Ward*, excluded coverage for losses caused by the "[d]ischarge, dispersal, seepage, migration, release or escape of pollutants," and defined "pollutants" as follows:

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Ward*, 715 F. Supp. 2d at 715.  The court found the pollution exclusion to preclude recovery for property damage caused by Chinese Drywall:

> Applying City of Chesapeake, the Court must determine whether there has been a "[d]ischarge, dispersal, seepage, migration, release or escape of pollutants" within the meaning of the pollutant exclusion. (Compl. Ex. A at 8.) Defendant argues that there has been no discharge or dispersal because "there are no facts suggesting any movement by the" Chinese Drywall. (Def.'s Br. 29 n.34.) While counsel gets points for creativity, the Court rejects this argument. It is obvious that the relevant dispersal or discharge in this case is the discharge and dispersal of sulfuric gas from the Drywall. *See, e.g., Peace ex rel. Lerner v. Northwestern National Insurance Co.*, 228 Wis. 2d 106, 596 N.W.2d 429 (Wis. 1999)(holding that lead in paint that chips, flakes, or is reduced to dust is a pollutant). It is an

14

undisputed fact that the Chinese Drywall in Defendant's home has "off-gassed," dispersing and discharging sulfuric gases into the Ward Residence. (See Hejzlar Dec. P 7; Ward v. Peak Building Corp., No. CL09-5167, Compl. P 11.)

For similar reasons, the Court rejects Defendant's argument that Chinese Drywall is not a "contaminant" or a "pollutant." While the Drywall itself may not be a pollutant, the gases it releases are. There is no dispute that the Chinese Drywall has released reduced sulfur gases into the Ward Residence. (See Hejzlar Dec. P 9; Def.'s Br. at 4.) Both state and federal authorities recognize reduced sulfur gases as pollutants.  See, e.g., Standards of Performance for Kraft Pulp Mill: Standard for Total Reduced Sulfur (TRS), 40 C.F.R. § 60.283 (2000) (regulating emission of "total reduced sulfur"); Prevention of Significant Deterioration Areas, 9 Va. Admin. Code § 5-20-205 (2010) (listing reduced sulfur gases as "criteria pollutants"). Moreover, the broad definition of pollutants in the Policy includes "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Compl. Ex. A at 8.) Under any reasonable definition of these terms, the gases released into the Ward Residence qualify as irritants and contaminants.

*Id.* at 717-18 (footnotes omitted).

As in *Ward*, each policy with a Total Pollution Exclusion at issue here (all of the Hanover Policies and the 2007-2008 and 2008-2009 Citizens Policies) precludes coverage for property damage caused or contributed to by the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants.  *See* Ex. 2, Jan. 27, 2011 Makimoto Aff. at Exh. A-F, Total Pollution Excl. (form no. CG 21 49 09 00); Umbrella Liability – Total Pollution Exclusion (Form No. 472-0238 05/04).  As in *Ward*, "[i]t is obvious that the relevant dispersal or discharge in this case is the discharge and dispersal of sulfuric gas from the Drywall." *Ward*, 715 F. Supp. 2d at 717.  Moreover, as in *Ward*, DMC cannot dispute "that the Chinese Drywall in [the affected homes] has 'off-gassed,' dispersing and discharging sulfuric gases into the [affected homes]." *Id.*

Finally, each of the policies at issue here defines "pollutants" broadly as did the policy at issue in *Ward*.  Indeed, the definition of "pollutants" at issue in *Ward* is identical or nearly identical to that found in each of the Defendant policies at issue here.  The sulfur gases that are

claimed to have caused property damage in this matter are therefore without any doubt "pollutants," and DMC has no reasonable basis for arguing otherwise.

This Court should, as in *Ward*, hold that each of the Defendants' polices with a Total Pollution Exclusion bar coverage for the property damage claimed by DMC.

<u>**Conclusion**</u>

For the foregoing reasons, Citizens and Hanover respectfully request that the Court grant their Motions For Summary Judgment finding that the Total Pollution Exclusion provision in the 2007-2008 and 2008-2009 Citizens Policies and all of the Hanover Policies exclude coverage for damages alleged by DMC.

Dated:  February 1, 2011                    Respectfully submitted,


                                        _____/s/_____
                                        Thomas S. Garrett
                                        VSB No.  73790
                                        Counsel for Hanover Insurance Company
                                        and Citizen's Insurance Company of America
                                        Harman, Claytor, Corrigan & Wellman, P.C.
                                        P.O. Box 70280
                                        Richmond, Virginia  23255
                                        Phone: 804-747-5200
                                        Fax: 804-747-6085
                                        tgarrett@hccw.com

                                        and

                                        John P. Malloy
                                        (*pro hac vice* application pending)
                                        Counsel for Hanover Insurance Company
                                        and Citizen's Insurance Company of America
                                        Robinson & Cole LLP
                                        280 Trumbull Street
                                        Hartford, CT 06103
                                        Phone:  860-275-8200
                                        Fax:  860-275-8299
                                        jmalloy@rc.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of February, 2011, I will electronically file a redacted version of the foregoing Memorandum in Support with non-confidential supporting documentation with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the individuals listed below.  In addition, I certify that I will file "UNDER SEAL" an unredacted copy of the Memorandum in Support and confidential supporting documentation with the Clerk's Office in a sealed envelope.  I further certify that I will serve by electronic mail and U.S. Mail an unredacted copy of the Memorandum in Support and confidential supporting documentation on the following:

W. Edgar Spivey, Esq.
Kristan B. Burch, Esq.
R. Johan Conrod, Jr., Esq.
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
*Counsel for Plaintiff Dragas Management Corporation*

_____/s/_____
Thomas S. Garrett
VSB No.  73790
Counsel for Hanover Insurance Company
and Citizen's Insurance Company of America
Harman, Claytor, Corrigan & Wellman, P.C.
P.O. Box 70280
Richmond, Virginia  23255
Phone: 804-747-5200
Fax: 804-747-6085
tgarrett@hccw.com