

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DRAGAS MANAGEMENT CORPORATION,

    Plaintiff,

v.    CIVIL ACTION NO: 2:10cv547

HANOVER INSURANCE COMPANY, and
CITIZENS INSURANCE COMPANY OF AMERICA,

    Defendants.

## MEMORANDUM OPINION

This case comes before the court on Dragas Management Corporation's ("DMC") Motion for Partial Summary Judgment ("Motion"), filed December 31, 2010. See Docket # 11. For the reasons which follow, the court **GRANTS IN PART** and **DENIES IN PART** DMC's Motion.

### I.[1]

DMC is a company that builds residential homes and housing developments in the Hampton Roads area. Two such developments are The Hampshires at Greenbriar ("The Hampshires"), located in Chesapeake, Virginia, and Cromwell Park at Salem ("Cromwell Park"), located in Virginia Beach, Virginia.[2] DMC hired, via

---

[1] For its recitation of the undisputed facts in this case, the court relies on the Final Pretrial Order, agreed to by the parties and filed on June 3, 2011. See Docket # 86.

[2] More information on the facts underlying this case, particularly as regards the development of Cromwell Park and The Hampshires, is available in the court's opinion in a predecessor

subcontract agreement, Porter-Blaine Corp. ("Porter-Blaine") to supply and install the drywall for the homes at The Hampshires and Cromwell Park.

Some of the drywall installed at the developments was manufactured in China. In total, seventy-four (74) of the homes, sixty-eight (68) at The Hampshires and six (6) at Cromwell Park, had Chinese drywall installed in them. The Chinese drywall was defective and contained levels of elemental sulfur approximately three hundred seventy-five (375) times greater than representative samples of domestic drywall. As a result, it caused property damage to the homes where it was installed by corroding HVAC coils, damaging wiring, tarnishing or corroding metal objects, and causing a bad odor. The source of the corrosion, pitting, tarnishing, and blackening of the electronics and metal components was reduced sulfur gases.[3]

DMC discovered the problem with the drywall in early 2009 and requested at that time that Porter-Blaine remove and replace the drywall and fix the other damage to the homes, but Porter-Blaine refused. Therefore, DMC remediated the problem itself by moving the affected homeowners out of their homes, tearing out

---

case involving different parties. See Dragas Mgmt. Corp. v. Builders Mut. Ins. Co., No. 2:09cv185, ___ F. Supp. 2d ___, 2011 W.L. 2473263 (E.D. Va. June 13, 2011).

[3] Reduced sulfur gases include hydrogen disulfide, carbon disulfide, and carbonyl sulfide.

the defective drywall, replacing it, and repairing or replacing the other property damaged by the drywall, all at its own cost.[4]

### B.

During the relevant time period, Porter-Blaine carried both commercial general liability insurance and an umbrella excess liability policy. Porter-Blaine's commercial general liability policy, policy number ZBR 7905525, was provided by Citizens Insurance Co. of America ("Citizens").[5] The commercial general liability policy insured Porter-Blaine for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The coverage was only triggered by "an 'occurrence' that takes place in the 'coverage territory' . . . during the policy period." An occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Citizens policy had a $1,000,000 per occurrence limit and a $2,000,000 aggregate limit.[6]

---

[4] The parties agree that DMC's Trial Exhibits 72 and 89 are accurate summaries of the costs of remediating the drywall damage at both developments.

[5] Porter-Blaine carried a separate policy with Citizens during the coverage years of 2005-2006, 2006-2007, 2007-2008, and 2008-2009, but each of the policies has the same policy number.

[6] The policy did not carry a deductible.

3

Porter-Blaine's umbrella excess liability policy, policy number UHR 7917898, was provided by The Hanover Insurance Co. ("Hanover").[7] The umbrella excess liability policy insured Porter-Blaine for "the 'ultimate net loss' in excess of the 'retained limit'[8] because of 'bodily injury' or 'property damage' to which this insurance applies," which is caused by an occurrence during the policy period.[9] "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury or property damage." The Hanover umbrella excess liability policy had a $10,000,000 per occurrence limit and a $10,000,000 aggregate limit.

C.

Because of Porter-Blaine's refusal to replace the drywall and remediate the other damage and the subsequent costs DMC

---

[7] Similar to its policies with Citizens, Porter-Blaine's policies with Hanover were all individual policies for the policy years 2005-2006, 2006-2007, 2007-2008, and 2008-2009, which all had the same policy number.

[8] "Retained limit" is defined as "the available limits of 'underlying insurance.'"

[9] The 2005-2006 umbrella excess liability policy is worded slightly differently, insuring Porter-Blaine for "those sums in excess of underlying insurance that any insured becomes legally obligated to pay as damages" during the policy period which are "caused by an occurrence." The court has previously held that the difference in wording has no material effect on the content of the policy. See Dragas, No. 2:09cv185, 2011 W.L. 2473263 at *3, n. 8.

4

incurred in doing so itself, DMC filed a demand for arbitration against Porter-Blaine on June 26, 2009. A five-day arbitration hearing was held where witnesses testified and lawyers for both sides made arguments.[10] On October 7, 2010, the arbitrator found Porter-Blaine at fault and awarded DMC $4,900,000 in damages, plus post-judgment interest, costs, and expenses. DMC then exercised its right to convert the arbitration into a judgment with the Circuit Court for the City of Virginia Beach on November 12, 2010. The entirety of the judgment is currently outstanding.

Because of its inability to collect the judgment from Porter-Blaine, DMC filed suit in this court under diversity jurisdiction seeking to enforce the arbitration award against Porter-Blaine's insurers, Citizens and Hanover, on November 3, 2010. Before discovery had begun, DMC filed this Motion on December 31, 2010. Citizens and Hanover responded on January 14, 2011, and DMC replied on January 21, 2011.[11] The motion is now ripe for consideration.[12]

---

[10] Citizens and Hanover defended Porter-Blaine at the arbitration.

[11] On June 8, 2011, this court granted DMC's Motion to Supplement Record in Support of Motion for Partial Summary Judgment. See Docket #89.

[12] There is another Motion for Partial Summary Judgment filed by Citizens and Hanover pending in this case. See Docket # 31. The court does not consider that motion in this Memorandum Opinion.

5

## II.

Summary judgment is appropriate when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). A party opposing a motion for summary judgment may not rest on the pleadings alone, but must instead show that "specific, material facts exist that give rise to a genuine triable issue." Hagan v. McNallen (In re McNallen), 62 F.3d 619, 623-24 (4th Cir. 1995). In essence, the non-movant must present evidence "on which a [trier of fact] could reasonably find" for the non-moving party. Anderson, 477 U.S. at 252. Such facts must be presented in the form of exhibits and sworn affidavits. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1993) ("A motion for summary judgment may not be defeated by evidence that is 'merely colorable' or 'is not sufficiently probative.'" (quoting Anderson, 477 U.S. at 249-50)).

On summary judgment, the court is not to "weigh the evidence and determine the truth of the matter." Anderson, 477 U.S. at

249. Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). But a failure by a plaintiff to rebut a defendant's motion with sufficient evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (finding district courts have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." (citing Celotex, 477 U.S. at 323-24)).

III.

DMC has moved for partial summary judgment only as to the Citizens commercial general liability policies for the periods of 2005-2006 and 2006-2007. With respect to those policies, DMC seeks judgment that: (1) the installation of the defective drywall and ensuing damage was an occurrence under the policy; (2) the installation of the drywall at each house constituted a separate occurrence under the policy; and (3) the "your work"

7

exclusion does not bars coverage under these facts. The court considers each of these issues individually.

### A.

With regard to the first issue, DMC argues that the installation of and damage caused by the defective drywall constitutes an occurrence as it is defined in the policies. Citizens and Hanover appear to agree in part. They do not contest that damage caused by a subcontractor's defective work to an insured's non-defective work is an occurrence under the policies. However, Citizens and Hanover argue that DMC has not proven that summary judgment is proper at this juncture, because the defective condition of the drywall itself is not an occurrence and DMC has not shown the cost it accrued in remedying damage to non-defective work separate from the cost of replacing the drywall itself.[13]

Under Virginia law, an insured bears the burden of bringing itself within the insurance policy coverage. Maryland Cas. Co. v. Cole, 158 S.E. 873, 876 (Va. 1931). Thus DMC must show that it meets all the conditions for coverage to attach. The policies in question define "occurrence" as "an accident,

---

[13] Citizens and Hanover make a similar argument that any cost to replace the defective drywall was not "property damage" under the policy. Because the court finds that such replacement is not an "occurrence" pursuant to the policy, the court need not take up this additional argument. The same is true for Citizens' and Hanover's argument concerning the faulty workmanship exclusion.

8

including continuous or repeated exposure to substantially the same general harmful conditions." E.g., Compl. Ex. B. at 20. The policies do not define what is meant by an "accident." Black's Law Dictionary defines "accident" as "[a]n <u>unintended</u> and <u>unforeseen</u> injurious occurrence." Black's Law Dictionary 15 (7th ed. 1999) (emphasis added); see also Wooden v. John Hancock Mut. Life Ins. Co., 139 S.E. 2d 801, 804 (Va. 1965); Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W. 2d 65, 76 (Wis. 2004). Thus, under the policy, an occurrence is an unforeseen and unintended consequence.

The Fourth Circuit has previously discussed whether damage caused by the defective work of a subcontractor is an occurrence under a commercial general liability policy. First, in French v. Assurance Co. of America, 488 F.3d 693 (4th Cir. 2006), the Fourth Circuit determined, under Maryland law, whether the installation by a subcontractor of defective synthetic stucco to the outside of a home that allowed moisture to damage the otherwise non-defective walls was an occurrence. The court drew a line between the replacement of the defective stucco itself and the resulting damage to non-defective areas of the home. The court initially held that because the contractor had hired the subcontractor specifically to install the stucco, the necessity of repairing or replacing the stucco was not unforeseen, and therefore not an occurrence. Id. at 703.

However, the court drew the opposite conclusion with relation to the damage done to the rest of the house where moisture had been allowed to seep in. The court held that the commercial general liability policy "provides liability coverage for the cost to remedy unexpected and unintended property damage to the contractor's otherwise nondefective work-product caused by the subcontractor's defective workmanship." Id. at 706.

The court reached the same conclusion in an unpublished opinion, Stanley Martin Cos., Inc. v. Ohio Casualty Group, 313 Fed. Appx. 609 (4th Cir. 2009), applying Virginia law. In that case, a subcontractor installed defective trusses in a number of townhouses, which trusses caused mold to grow. The court held that the contractor's obligation to replace the defective trusses "was not unexpected or unforeseen under the terms of its building contracts for the townhouses," but the damage which spread beyond the trusses to non-defective parts of the homes "was an unintended accident, or an occurrence that triggered coverage." Id. at 614. Thus, again the court held that the replacement of the defective work was not an occurrence but that repair of the other damage caused by the defective work was.

This court sees no reason why the decisions in Stanley Martin and French should not control the results in this case. Therefore, under the Fourth Circuit's precedent, this court holds that the replacement of the defective drywall is not an

occurrence under the policy; however, any repair or replacement of non-defective components of the homes at The Hampshires and Cromwell Park or personal property of the homeowners constituted an occurrence under the Citizens policies at issue.

### B.

As to the second issue, DMC argues that each installation of the defective drywall constitutes a separate occurrence because the introduction of the drywall was the cause of the resulting damage. Citizens and Hanover argue, to the contrary, that the damage had a single cause, the purchase of the defective Chinese drywall by Porter-Blaine.

Virginia follows the "cause" test for determining the number of occurrences under an insurance policy. E.g., Am. Cas. Co. of Reading, Pa. v. Heary, 432 F. Supp. 995, 997 (E.D. Va. 1977). Thus, court must look to the cause of the injury in deciding the number of occurrences. Citizens and Hanover rely on a case from the South Carolina Supreme Court, Owners Ins. Co. v. Salmonsen, 622 S.E. 2d 525 (S.C. 2005), where that court held that in the distribution of defective goods, there was only one occurrence because "the distributor has taken no distinct action giving rise to liability for each sale." Id. at 526. However, this court finds that case inapposite because there the insured in question _only_ _distributed_ the defective product; it _did_ _not_

install or otherwise involve itself with the product post-distribution.

DMC, by contrast, relies on the Virginia Supreme Court's decision in S.F. v. Western American Insurance Co., 463 S.E. 2d 450 (Va. 1995). In that case, the plaintiffs sought recovery from a property management company for the resident manager's molestation of a number of children. In determining how many occurrences there were under the policy, the court found that the word "occurrence" under the policy was ambiguous. Id. at 452. Therefore, the court construed the policy in favor of coverage and found that there was a separate occurrence for each child that was molested, though not a separate occurrence for each time that child was molested given the ongoing pattern of conduct. Id.

No Virginia court has applied the "cause" test to determine the number of occurrences in a construction case specifically, but the court finds one decision from Texas to be informative. In Lennar Corp. v. Great American Insurance Co., 200 S.W. 3d 651 (Tex. App. 2006), the Court of Appeals of Texas determined the number of occurrences in a case involving the application of defective stucco, which stucco allowed moisture damage to other parts of the house. The policy in question had the same definition of "occurrence" as the policies in this case, and Texas law both uses the "cause" test and has defined "accident"

under the policy in the same way as has Virginia law. Lennar contended that there was only one occurrence, the provision of the defective stucco. The court disagreed and held that the installation in each home constituted an occurrence. Id. at 682. "Lennar was not the designer or the manufacturer of [the stucco]. Rather, Lennar's liability stemmed from the fact that it built and sold homes with [the stucco]. Thus, Lennar's liability to a particular homeowner stemmed from the application of [the stucco], and the resulting damage, if any, to his or her particular home." Id.

Looking to the Virginia Supreme Court's reasoning in S.F. and the decision in Lennar, this court holds that each installation of the defective drywall constituted a separate occurrence.[14] The causation test directs the court to determine what ultimately caused the injury, more akin to a proximate cause type analysis. "Under the 'cause' analysis, the proper focus in interpreting 'occurrence' under a liability policy is on the number of events that cause the injuries and give rise to the insured's liability." Lennar, 200 S.W. 3d at 682. By focusing only on the initial purchase of the drywall, Citizens' and Hanover's causation argument begins too early in the process

---

[14] This court does not, however, find "occurrence" to be ambiguous, as did the court in S.F. Instead, this court bases its decision on the plain language of the policies.

and limits "occurrence" to this one action. While it is true that the initial purchase of the Chinese drywall was certainly a but-for cause of the damage, it was the act of installing the drywall in each home which set the chain of events culminating in the damage to that home. Thus, there were seventy-four (74) occurrences in this case, one for each affected home.[15]

The court does not, however, enter judgment for DMC for the amount requested. DMC bears the burden of proving that the "property damage" alleged occurred during the relevant policy period, here between 2005-2006 and 2006-2007. DMC has provided accurate accounting of its costs for remediation, but it has provided no such proof of when the damage occurred.[16] Furthermore, as noted above, coverage for an "occurrence" would only extend to the damage resultant from the defective drywall, not the replacement of the drywall itself. There has been some mention in this case that the drywall had to be removed and replaced anyway to allow access to the damaged components behind it, but DMC has not presented any specific proof as to that

---

[15] But see infra note 16.

[16] In addition, some of the affected homes did not have Certificates of Occupancy until after November 15, 2007, the expiration of the policy period for the two policies at issue in DMC's Motion, and thus there would clearly not be coverage for any damage thereto. This court thus expresses no opinion as to the number of occurrences that are covered by the two policies in question.

14

fact, and the court cannot determine whether the $4,900,000 damages award accurately reflects the recoverable costs. Thus, the court finds that under the facts presented, there were seventy-four (74) occurrences under the policy, but the court cannot determine which occurrences and what specific amounts are covered by the policy at this juncture.

C.

On the final issue, DMC asks the court to declare that the "your work" exclusion does not bar coverage under the policies because Porter-Blaine used subcontractors to install the drywall in each of the homes.[17] Citizens and Hanover argue to the contrary that summary judgment is improper at this stage because there is insufficient evidence of the use of subcontractors by Porter-Blaine.

The policies exclude from coverage "'property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard." E.g., Compl. Ex. B, at 11. However, "[t]his exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor." E.g., id. "Your work" is

---

[17] DMC additionally asks the court to declare that recovery for the cost of the replacement of the drywall itself is not barred by the "your work" exclusion, because such replacement was necessary to avoid further damage. This argument is unavailing in view of this court's conclusion that such replacement is not an occurrence under the policy. See supra Section III.A.

15

defined as "[w]ork or operations performed by you or on your behalf; and . . . [m]aterials, parts, or equipment furnished in connection with such work or operations." E.g., id. at 22. DMC points to testimony at deposition by Sam Porter that Porter-Blaine used second-tier subcontractors in the installation of the drywall. Mem. Supp. Mot. Summ. J., Ex. 1, Sam Porter Dep. 846:12-847:3. However, the evidence is far from clear whether Mr. Porter meant that Porter-Blaine always used subcontractors to install the drywall, or whether the subcontractors were used in addition to Porter-Blaine's own employees.[18] For that reason, summary judgment on the "your work" exclusion is not proper at this time as a dispute concerning material facts remains.[19]

---

[18] Furthermore, this issue is not clarified because of any further materials submitted to the court, as DMC argues that it is in its Memorandum in Support of Motion to Supplement Record in Support of Motion for Partial Summary Judgment. See Docket # 79. DMC contends therein that Citizens and Hanover cannot argue that there is insufficient proof as to the question of subcontractors for Porter-Blaine because Porter-Blaine did not take discovery on the issue. DMC seems to have forgotten that as the plaintiff and the summary judgment movant it bears the burden of proof. See infra note 19.

[19] Normally the insurer bears the burden of proof as to whether an exclusion bars coverage under the policy. See Allstate Ins. Co. v. Gauthier, 641 S.E. 2d 101, 104 (Va. 2007) (citing Transcontinental Ins. Co. v. RBMW, Inc., 551 S.E. 2d 313, 318 (Va. 2001)). However, because DMC, the insured, has moved for summary judgment and a declaration that an exclusion is inapplicable, DMC bears the burden of proof in this instance.

## IV.

Accordingly, as detailed herein, the court **GRANTS IN PART** and **DENIES IN PART** DMC's Motion, determining that the damage caused by the defective Chinese drywall constituted a separate occurrence for each affected home. The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion to counsel for all parties.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
United States District Judge

REBECCA BEACH SMITH
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 21, 2011