UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



DRAGAS MANAGEMENT CORPORATION,

      Plaintiff,

v.                       CIVIL ACTION NO: 2:10cv547

HANOVER INSURANCE COMPANY, and
CITIZENS INSURANCE COMPANY OF AMERICA,

      Defendants.

## OPINION

This case comes before the court on the defendant insurers', Citizens Insurance Company of America ("Citizens") and Hanover Insurance Company ("Hanover"), Motion for Partial Summary Judgment ("Motion"), filed February 1, 2011. See Docket # 31. For the reasons which follow, the court **GRANTS** the insurers' Motion.

## I.[1]

This Opinion once again concerns the installation of Chinese drywall at two developments in the Hampton Roads area, Cromwell Park at Salem ("Cromwell Park") and The Hampshires at

---

[1] The court has recounted the facts underlying this case on two previous occasions. See Dragas Mgmt. Corp. v. Hanover Ins. Co., No. 2:10cv547, __ F. Supp. 2d __, 2011 W.L. 2982097 (E.D. Va. July 21, 2011); Dragas Mgmt. Corp. v. Builders Mut. Ins. Co., No. 2:09cv185, __ F. Supp. 2d __, 2011 W.L. 2473263 (E.D. Va. June 13, 2011). Therefore, the court will only briefly summarize those facts that have been set out in depth before and instead will focus on the facts that are particularly important to the instant Motion.

Greenbriar ("The Hampshires").  These housing developments were built by Dragas Management Corp. ("DMC").  As general contractor, DMC executed a subcontract agreement with Porter-Blaine Corp. ("Porter-Blaine"), a local drywall contractor, for the provision and installation of the drywall in all the units at both developments.  Some of the drywall Porter-Blaine procured and installed at The Hampshires and Cromwell Park was manufactured in China.  The Chinese drywall was installed in seventy-four (74) of the homes, sixty-eight (68) at The Hampshires and six (6) at Cromwell Park.

A.

The Chinese drywall contained levels of elemental sulfur approximately three hundred seventy-five (375) times greater than representative samples of domestic drywall.  As a result, it caused property damage to the homes by damaging and corroding metal components, including HVAC coils, wiring, copper piping, and electronics.  For example, the houses with Chinese drywall experienced a failure rate of over thirty percent (30%) of the air conditioning coils.  By contrast, in homes with domestic drywall, the failure rate was less than one percent (1%).  Homes with Chinese drywall exhibited pitting of copper piping, blackening of wiring, and corrosion of metal objects inside the home.  In addition, many homeowners reported a bad, rotten-egg smell.  All parties agree that the source of the corrosion and

2

damage was reduced sulfur gases, including hydrogen disulfide, carbon disulfide, and carbonyl sulfide.[2]

DMC discovered the problem with the Chinese drywall in early 2009 and requested that Porter-Blaine remediate all the damage to the homes and replace the drywall. Porter-Blaine refused, and DMC undertook the remediation at its own cost, removing and replacing the drywall, the affected structural components, and the damaged personal property.[3] DMC then filed a demand for arbitration against Porter-Blaine on June 26, 2009, seeking recovery for the cost of remediation. On October 7, 2010, the arbitrator found Porter-Blaine at fault and awarded DMC $4,900,000 in damages, plus post-judgment interest, costs, and expenses.[4] DMC then exercised its right to convert the arbitration into a judgment with the Circuit Court for the City of Virginia Beach on November 12, 2010. The entirety of the judgment is currently outstanding.

---

[2] The parties agree in the Final Pretrial Order that the Chinese drywall "caused property damage to certain other components of the homes where it was installed" but do not agree as to how the sulfur gases were actually formed or released. See Docket # 86, Final Pretrial Order, at ¶ 7. In other words, DMC does not concede that the sulfur gases were discharged, dispersed, or released from the drywall. See infra Section III.D.

[3] The parties agree that DMC's Trial Exhibits 72 and 89 are accurate summaries of the costs of remediating the drywall damage at both developments.

[4] Citizens and Hanover defended Porter-Blaine at the arbitration.

**B.**

During the relevant time period, Porter-Blaine carried both commercial general liability (CGL) insurance and an umbrella excess liability (umbrella) policy. Porter-Blaine's CGL policy, policy number ZBR 7905525, was provided by Citizens.[5]  The CGL policy insured Porter-Blaine for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." See Mem. Supp. Mot. Summ. J., Ex. 1, Makimoto Decl., Ex. 1-A, Ex. 1-B, Ex. 1-C & Ex. 1-D (2005-2006, 2006-2007, 2007-2008 & 2008-2009 Citizens CGL policies).  The coverage was only triggered by "an 'occurrence' that takes place in the 'coverage territory' . . . during the policy period." Id.  An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id.  The Citizens policy had a $1,000,000 per occurrence limit and a $2,000,000 aggregate limit.[6]

Porter-Blaine's umbrella policy, policy number UHR 7917898, was provided by Hanover.[7]  The umbrella policy insured Porter-

---

[5] Porter-Blaine carried a separate policy with Citizens during the coverage years of 2005-2006, 2006-2007, 2007-2008, and 2008-2009, but each of the policies has the same policy number.

[6] The policy did not carry a deductible.

[7] Similar to its policies with Citizens, Porter-Blaine's policies with Hanover were individual policies for the policy years

Blaine for "the 'ultimate net loss' in excess of the 'retained limit'[8] because of 'bodily injury' or 'property damage' to which this insurance applies," which is caused by an occurrence during the policy period. See Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-D, 2-E, & 2-F (2006-2007, 2007-2008, & 2008-2009 Hanover umbrella policies).[9] "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury or property damage." Id. The Hanover umbrella excess liability policy had a $10,000,000 per occurrence limit and a $10,000,000 aggregate limit.

Both the Citizens and Hanover policies contained certain exclusions from coverage. Importantly for this case, the 2007-2008 and 2008-2009 Citizens CGL policies, as well as all the Hanover umbrella policies, contained an absolute pollution

---

2005-2006, 2006-2007, 2007-2008, and 2008-2009, which all had the same policy number.

[8] "Retained limit" is defined as "the available limits of 'underlying insurance.'" See Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-D, 2-E, & 2-F (2006-2007, 2007-2008, & 2008-2009 Hanover umbrella policies).

[9] The 2005-2006 Hanover umbrella policy is worded slightly differently, insuring Porter-Blaine for "those sums in excess of underlying insurance that any insured becomes legally obligated to pay as damages" during the policy period which are "caused by an occurrence." See Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-C (2005-2006 Hanover umbrella policy). The court has previously held that the difference in wording has no material effect on the content of the policy. See Dragas, No. 2:09cv185, 2011 W.L. 2473263 at *3, n. 8.

exclusion.   The two Citizens policies in question excluded from

coverage:

    (1)   "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

    (2)   Any loss, cost or expense arising out of any:

        (a)   Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

        (b)   Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of, "pollutants."

See Mem. Supp. Mot. Summ. J., Ex. 1, Makimoto Decl., Ex. 1-C & Ex. 1-D (2007-2008 & 2008-2009 Citizens CGL policies). "Pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Id.

    The 2005-2006 Hanover umbrella policy excluded from coverage:

    (A)   Any liability or expense arising out of or contributed to in any way by the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or existence of pollutants at any time in any location.

6

(B)   Any loss, cost or expense arising out of any:

   (1)   Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

   (2)   Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or assess the effects of pollutants.

See Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-C (2005-2006 Hanover umbrella policy). "Pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or containment, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, radioactive materials, hazardous biological agents or waste. Waste includes materials to be recycled, reconditioned or reclaimed." Id.

   The 2006-2007, 2007-2008, and 2008-2009 Hanover umbrella policies excluded from coverage:

   (1)   "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

   (2)   "Pollution cost or expense".

See Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-D, 2-E, & 2-F (2006-2007, 2007-2008, & 2008-2009 Hanover umbrella

policies).   "Pollutants" is defined as "any solid, liquid,
gaseous or thermal irritant or containment, including smoke,
vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste
includes materials to be recycled, reconditioned or reclaimed."
Id.   "Pollution cost or expense" is defined as:

> Any loss, cost or expense arising out of any:
>
>> a. Request, demand, order or statutory or regulatory
>>    requirement that any insured or others test for,
>>    monitor, clean up, remove, contain, treat,
>>    detoxify or neutralize, or in any way respond to,
>>    or assess the effects of pollutants; or
>>
>> b. Claim or suit by or on behalf of a governmental
>>    authority for damages because of testing for,
>>    monitoring, cleaning up, removing, containing,
>>    treating, detoxifying or neutralizing, or in any
>>    way respond to, or assess the effects of
>>    "pollutants".

Id.   Overall, then, the policies define "pollutants" in the same
way[10] and have similar elements in each absolute pollution
exclusion.

### C.

On November 3, 2010, DMC filed suit in this court under
diversity jurisdiction, seeking to enforce the $4,900,000
arbitration award against Porter-Blaine's insurers.   Citizens

---

[10] The 2005-2006 Hanover umbrella policy's definition adds
"radioactive materials" and "hazardous biological agents" as
categories of "pollutants," but this addition neither has
application in this case nor any material effect on the
definition of pollutant, and thus all the definitions will be
interpreted in the same way.

and Hanover filed the instant Motion on February 1, 2011.   DMC responded on February 17, 2011, and the insurers replied on February 25, 2011.[11]   The Motion is now ripe for consideration.

## II.

Summary judgment is appropriate when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.   See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).   A party opposing a motion for summary judgment may not rest on the pleadings alone, but must instead show that "specific, material facts exist that give rise to a genuine triable issue." Hagan v. McNallen (In re McNallen), 62 F.3d 619, 623-24 (4th Cir. 1995).   In essence, the nonmovant must present evidence "on which a [trier of fact] could reasonably find" for the non-moving party.   Anderson, 477 U.S. at 252.   Such facts must be presented in the form of exhibits and sworn affidavits. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,

---

[11] On May 27, 2011, this court granted Citizens' and Hanover's Motion for Leave to Submit Recently-Decided Authority in Further Support of Motion for Partial Summary Judgment. See Docket ## 76, 81.

981 F.2d 160, 163 (4th Cir. 1993) ("A motion for summary judgment may not be defeated by evidence that is 'merely colorable' or 'is not sufficiently probative.'" (quoting Anderson, 477 U.S. at 249-50)).

On summary judgment, the court is not to "weigh the evidence and determine the truth of the matter." Anderson, 477 U.S. at 249. Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). However, a failure by a plaintiff to rebut a defendant's motion with sufficient evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (finding district courts have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." (citing Celotex, 477 U.S. at 323-24)).

### III.

Citizens and Hanover have moved for partial summary judgment, seeking a declaration that the Citizens CGL policies for the periods of 2007-2008 and 2008-2009, as well as all the Hanover umbrella policies, bar recovery of the judgment for the costs of remediating the property damage to the homes because of the absolute pollution exclusion. The insurers argue that the exclusion is non-ambiguous and clearly prevents coverage for damage to the homes caused by the reduced sulfur gases from the defective drywall. DMC responds with three contentions: (1) the exclusion is ambiguous and should be construed against the insurer; (2) the exclusion is substantively unreasonable and should be construed in favor of coverage; and (3) there is insufficient evidence of any dispersal, discharge, or release of pollutants. Under the analysis required by Virginia law, this court first considers whether the exclusion is ambiguous and then turns to whether the drywall was a "pollutant" under the policy and, if so, whether there was a "discharge, dispersal, seepage, migration, release or escape" of the pollutant in question.

### A.

Turning first to the issue of ambiguity, the court must initially determine whether all of the exclusions in the different policies may be construed together or if any

11

substantive difference requires them to be interpreted individually. The two Citizens CGL policies at issue, as well as the 2006-2007, 2007-2008, and 2008-2009 Hanover umbrella policies, all contain the same language, and thus there is no question that they may be interpreted together. The one policy that contains different language is the 2005-2006 Hanover umbrella policy. Where all of the other policies provide that what is excluded is "'Bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time," the 2005-2006 Hanover umbrella policy excludes "[a]ny liability or expense arising out of or contributed to in any way by the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or existence of pollutants at any time in any location." Compare, e.g., Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-D, 2-E, & 2-F (2006-2007, 2007-2008, & 2008-2009 Hanover umbrella policies) to Mem. Supp. Mot. Summ. J., Ex. 2, Makimoto Decl., Ex. 2-C (2005-2006 Hanover umbrella policy) (emphasis added). Thus, the 2005-2006 Hanover policy in question is broader than the other absolute exclusions, because the harm is not limited to "bodily injury" or "property damage" but instead includes "any liability or expense." The part of the exclusion dealing with causation appears to be materially

the same, because the 2005-2006 Hanover policy denies coverage for any injury "contributed to in any way" by pollutants, while the rest of the policies deny coverage for injury caused "in whole or in part" by the "actual, alleged, or threatened" release of pollutants.   Therefore, the court concludes, as an initial matter, that all of the exclusions in the various policies may be considered together, because, if an injury is excluded under the standard language of all the policies, except the 2005-2006 Hanover umbrella policy, then it would certainly be so excluded under that policy given its greater breadth.

### B.

Virginia law is well-settled with regard to the interpretation of insurance contracts and exclusions, and this court sitting in diversity is bound to apply it.[12]

> The interpretation of a contract presents a question of law. Bentley Funding Group, L.L.C. v. SK & R Group, L.L.C., 609 S.E.2d 49, 53 (Va. 2005).   The contract is construed as written, without adding terms that were not included by the parties.   Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984).   When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 463 S.E.2d 661, 664 (Va. 1995). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words

---

[12] See Erie R.R. Co. v. Thompkins, 304 U.S. 64 (1938) (establishing that federal courts apply substantive state law under diversity jurisdiction).

needlessly." <u>D.C. McClain, Inc. v. Arlington County</u>,
452 S.E.2d 659, 662 (Va. 1995).

<u>City of Chesapeake v. States Self-Insurers Risk Retention Grp.,
Inc.</u>, 628 S.E. 2d 539, 541 (Va. 2006).

Under Virginia law, a term of a contract is considered
ambiguous "when it may be understood in more than one way or
when it refers to two or more things at the same time." <u>Granite
State Ins. Co. v. Bottoms</u>, 415 S.E. 2d 131, 134 (Va. 1992). An
exclusion is not considered ambiguous merely because the parties
disagree as to its meaning, <u>Plunkett v. Plunkett</u>, 162 S.E. 2d
39, 42 (Va. 2006), nor does the conclusion reached by other
jurisdictions as to ambiguity have any bearing on the question
under Virginia law. <u>City of Chesapeake</u>, 628 S.E. 2d at 541-42.
Thus, Virginia law construes the contract strictly to effectuate
the intentions of the parties, giving terms their plain meaning,
and declining to read in an ambiguity or meaning the parties did
not intend. <u>Floyd v. Northern Neck Ins. Co.</u>, 427 S.E. 2d 193,
196 (Va. 1993); <u>see</u> <u>also</u> <u>Firemen's Ins. Co. of Washington, D.C.
v. Kline & Son Cement Repair, Inc.</u>, 474 F. Supp. 2d 779, 788
(E.D. Va. 2007) ("Virginia strictly adheres to the 'plain
meaning' rule: where an agreement is complete on its face and
is plain and unambiguous in its terms, the court is not at
liberty to search for its meaning beyond the instrument itself
because the writing is the repository of final agreement between

the parties." (internal quotation marks and citation omitted)).
However, in interpreting exclusions to insurance coverage, the
burden is on the insurer to prove the exclusion applies, and
courts are to construe the terms of exclusions strongly against
the insurer.  <u>Transcon. Ins. Co. v. RBMW, Inc.</u>, 551 S.E. 2d 313,
318 (Va. 2001).

The court thus turns to the interpretation of the exclusion
in question and the question of whether it is ambiguous.  This
case is not the first to present this issue for determination as
regards the pollution exclusion under Virginia law; indeed it is
not even the first to do so in this district with regard to the
exclusion's application to Chinese drywall.  <u>See</u> <u>Nationwide Mut.</u>
<u>Ins. Co. v. Overlook, L.L.C.</u>, __ F. Supp. 2d __, 2011 W.L.
1988396 (E.D. Va. May 13, 2011) (Davis, J.); <u>Travco Ins. Co. v.</u>
<u>Ward</u>, 715 F. Supp. 2d 699 (E.D. Va. 2010) (Doumar, S.J.); <u>see</u>
<u>also</u> <u>Proto v. Futura Grp., L.L.C.</u>, No. CL09-2455, slip. op. (Va.
Cir. Ct. May 6, 2011).  Initially, and while the court does not
find it decisive, the court notes that in all the cases it
located that concern the pollution exclusion, no court, save
one, the weight of which precedent is in question, has ever
found the exclusion ambiguous.[13]

The leading case on the pollution exclusion is the Virginia
Supreme Court's decision in <u>City of Chesapeake</u>, 628 S.E. 2d 539.

---

[13] <u>See</u> <u>infra</u> note 15.

In that case, a group of women sued the City of Chesapeake, claiming that exposure to trihalomethanes ("THMs") in the water supply caused them to have miscarriages. The case initially went before the Virginia Supreme Court on liability, and the court held that the suit was barred by sovereign immunity. The City then sought to recover the cost of its substantial legal fees spent litigating that case from its insurer. The City's insurer argued that recovery was barred by the pollution exclusion contained in the policy. The Virginia Supreme Court agreed, holding that the plain language of the pollution exclusion encompassed the injury caused by THMs in the water supply. Id. at 541. While the court did not interpret the policy in depth, it concurred with the insurer that the policy language was plain, clear and not ambiguous.

DMC argues that City of Chesapeake does not resolve the pollution exclusion issues in this case and instead provides only minimal guidance because it does not speak to whether the pollution exclusion extends to all pollution or to only traditional environmental pollution. In essence, DMC claims that because City of Chesapeake concerned a chemical in the water supply, which would be considered traditional, large-scale environmental pollution, the case offers no guidance here where the type of harm is different than normal environmental

pollution.[14]  The precedent on this point under Virginia law is uniform:  Virginia makes no distinction between traditional and non-traditional pollution when no such distinction exists in the policy.  See Travco, 715 F. Supp. 2d at 717 ("Under Virginia law, pollutant exclusions are not limited to 'traditional environmental pollution.'"); Kline, 474 F. Supp. 2d at 796 ("To hold [otherwise] would require this Court to interject words into the writing contrary to the elemental rule that the function of the court is to construe the contract made by the parties, and not to reformulate a contract for them.").[15]  The court will not break with the weight of precedent on this point and holds that the pollution exclusion in the instant policies

---

[14] DMC cites a number of cases from around the states of the Fourth Circuit, which hold that the exclusion only applies to traditional environmental pollution.  E.g., NGM Ins. Co. v. Carolina's Power Wash & Painting, L.L.C., No. 2:08-cv-3378-DCN, 2010 WL 146482 (D.S.C. January 12, 2010) (unpublished) (applying South Carolina law), aff'd sub nom. NGM Ins. Co. v. Kuras, 407 Fed. Appx. 653 (4th Cir. 2011); Auto-Owners Ins. Co. v. Potter, 105 Fed. Appx. 484 (4th Cir. 2004) (applying North Carolina law).  However, these decisions are not dispositive here and do not offer particular guidance per the Virginia Supreme Court's express admonition that decisions by other jurisdictions as to the pollution exclusion do not control when Virginia law relies on the plain meaning rule.  City of Chesapeake, 628 S.E. 2d at 541-42

[15] The court does note one dissenting opinion from the Circuit Court for the City of Norfolk in Unisun Insurance Co. v. Schulwolf, 53 Va. Cir. 220, 2000 W.L. 33340659 (Va. Cir. Ct. 2000).  In that case, the Circuit Court held that the exclusion was ambiguous and applied only to environmental pollution.  Id. at *3.  The court remarks, however, that this decision was before City of Chesapeake and, as such, is abrogated by subsequent precedent.

is not limited to traditional environmental pollution, as the definition of "pollutant" evinces no such intent on the part of the parties.[16]

Given that conclusion, DMC argues that if that is the case, then the pollution exclusion is overly broad and thus ambiguous such that it should be construed against the insurers. In making this argument, DMC relies on two Virginia Supreme Court cases, Virginia Farm Bureau Mutual Insurance Co. v. Williams, 677 S.E. 2d 299 (Va. 2009), and Granite State Insurance Co. v. Bottoms, 415 S.E. 2d 131 (Va. 1992), as well as a host of cases from other jurisdictions.[17]   First, in Granite State, the Virginia Supreme Court found that an exclusion to the policy providing no coverage for "bodily injury . . . due to . . . the rendering of or failure to render . . . any service or treatment conductive to health or of a professional nature," was overly broad so as to be ambiguous.   Granite State, 415 S.E. 2d at 133. The court found that "the language is so broad that it may be

---

[16] While this question is not before the court in this case, the court notes the centrality of the definition in this determination by reference to another case from this district, Builders Mut. Ins. Co v. Parallel Design & Dev. L.L.C., __ F. Supp. 2d __, 2011 W.L. 1988402 (E.D. Va. May 13, 2011) (Davis, J.), which held that in a policy where "pollutant" was not defined, the exclusion was limited to traditional environmental pollution, because that was the ordinarily understood definition of the term.

[17] Again, the court does not consider the cases from outside Virginia.   See supra note 14.

understood in more than one way; indeed, it may be construed in many ways." Id. at 134. "[O]ne could reasonably argue that almost any condition or function of an adult home could be classified as 'conducive to health' of the residents and, hence, any injuries negligently caused there are excluded from coverage," which would gut the rest of the policy. Id. at 135. Thus, the court construed the language of the policy to cover the costs of treating a resident who was badly burned in the bath when left unattended.

In Williams, the Virginia Supreme Court again found a policy ambiguous and construed it in favor of coverage. In that case, the issue was the amount recoverable under an auto insurance policy that provided two different limits of the amount recoverable per person per accident. The court held that the "disparity in the stated limits of liability for 'each person' manifests an ambiguity regarding the extent of the total coverage for 'each person' under the policy." Williams, 677 S.E. 2d at 303. Thus, given the internal inconsistency in the policy, the court construed it in favor of the higher amount.

This court finds neither of these cases on point with the facts here. First, contrary to DMC's argument, the court does not find that the pollution exclusion is so broad as to be ambiguous. The exclusion itself provides no coverage for "'bodily injury' or 'property damage,' which would not have

occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time," though DMC's main quarrel seems to be with the definition of "pollutant" itself:  "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."   The court, like the other Virginia courts to consider this issue, finds that the definition of pollutant is plain, unambiguous, and not overly broad.[18]  It could be possible to devise some wholly implausible and unlikely hypothetical that tests the bounds of the exclusion, but that is not the inquiry here.  See Kline, 474 F. Supp. 2d at 791 ("The pertinent inquiry is not, as [the insured] contends, whether the policy's definition of 'pollutant' is so broad that virtually any substance, including many useful and necessary products, could be said to come within its ambit.  Rather, guided by the principle that ambiguity (or lack thereof) is to be determined by reference to a particular set of facts, we focus on the specific product at issue." (citation omitted)).  Furthermore, this case is certainly not like the exclusion in Granite State,

---

[18]  Compare In re Chinese Manufactured Drywall Prods. Liab. Litig., 759 F. Supp. 2d 822, 841 (D. La. 2010) (noting Louisiana precedent holding that the pollution exclusion is overly broad and declining to follow this court's decision in Travco because "the Virginia law on pollution exclusions is on the other side of split authority from Louisiana law").

in which specific and plausible examples of potential claims that demonstrated the breadth of the exclusion were easily ascertainable.

In addition, the court finds that to interpret the pollution exclusion broadly, as required by its plain language, would not nullify the rest of the policy's provisions, which was a concern in <u>Granite State</u>. See also <u>Overlook</u>, 2011 W.L. at *23. Finally, there is no internal inconsistency in the policy that would lead the court to construe the exclusion in favor of coverage as in <u>Williams</u>. Instead, the policy is consistent, plain, and not overly broad.[19]

Therefore, this court finds that the absolute pollution exclusion is not ambiguous and will enforce the plain meaning of its terms.

---

[19] DMC makes a related argument concerning overbreadth, contending that the pollution exclusion is substantively unreasonable and thus should be construed in favor of coverage. DMC particularly relied on <u>Williams</u> and its statement that "when an insurer seeks to limit coverage under a policy, the insurer must use language that is <u>reasonable</u>, clear, and unambiguous." <u>Williams</u>, 677 S.E. 2d at 302 (emphasis added). However, this court follows Judge Davis's excellent reasoning in <u>Overlook</u> and holds that "a Virginia court does not engage in a substantive analysis of whether it believes an insurance exclusion is in fact reasonable. In fact, such a test would be contrary to established principles of Virginia contract law." <u>Overlook</u>, 2011 W.L. 1988396 at *21. A court in Virginia, especially a federal court sitting in diversity, is not free to substitute its own conception of moral rectitude upon an agreement reduced to writing by the parties who are so bound by it. While public policy is a concern to the court in the situation presented, it must set those issues aside and interpret the contract before it.

C.

As this court will enforce the pollution exclusion as written, the next question to be addressed is whether the Chinese drywall under these facts was a "pollutant" as defined by the policy. Citizens and Hanover argue that the drywall was the source of the reduced sulfur gases which were a pollutant because they were a contaminant, as evidenced by the damage they inflicted on the homes. DMC responds that drywall, which is made out of gypsum, is a naturally occurring substance that often can contain sulfur. Thus, it is not a pollutant, because it is used every day around the country to build houses.

"Pollutant" is defined in the policies as "any solid, liquid, gaseous or thermal irritant or containment, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." See Mem. Supp. Mot. Summ. J., Ex. 1, Makimoto Decl., Ex. 1-C & Ex. 1-D (2007-2008 & 2008-2009 Citizens CGL policies); id., Ex. 2, Makimoto Decl., Ex. 2-D, 2-E, & 2-F (2006-2007, 2007-2008, & 2008-2009 Hanover umbrella policies).[20] The policy does not define what is meant by irritant or contaminant, so the court considers their ordinary meaning. W.

---

[20] The 2005-2006 Hanover umbrella policy has two additional categories that are not pertinent to this case. See supra note 10.

22

Am. Ins. Co. v. Johns Bros., Inc., 435 F. Supp. 2d 511, 516 (E.D. Va. 2006). The dictionary defines "irritant" as "something that irritates or excites," while "irritate" is defined as "to excite impatience, anger, or displeasure in." Webster's Third New International Dictionary 1197 (1968). Similarly, "contaminant" is defined as "something that contaminates," with "contaminate" defined as "to soil, stain, corrupt, or infect by contact or association." Id. at 491. The policy makes no indication that any specialized meaning was to be used, so the court will use these commonly understood definitions in interpreting the policy.

At the outset, the court agrees with DMC that drywall itself, no matter where it is sourced, is not normally a pollutant. However, even a product or substance which is not normally a pollutant may be rendered so in certain situations, and that is why the court looks to the specific facts of the case, not the characteristics of the substance in general, to determine whether it is a pollutant. Virginia courts considering this question have taken a common-sense approach. In City of Chesapeake, the court found that THMs were by necessity a contaminant because they are regulated under the Safe Drinking Water Act. City of Chesapeake, 628 F. Supp. 2d at

541.[21]   Similarly, in Kline, the epoxy/eurathane fumes from the floor sealant were deemed irritants, because it was uncontested they could irritate or injure the respiratory system.   Kline, 474 F. Supp. 2d at 790.   Finally, in Johns Brothers, the court found it self-explanatory that fuel oil leaking into the ground, which necessitated $25,000 in cleanup costs, was a contaminant. Johns Bros., 435 F. Supp. 2d at 516.

Likewise, courts considering whether reduced sulfur gases are pollutants have looked to their effects.   Overlook found that the gases were both irritants and contaminants because they caused health issues in the inhabitants of the homes where the Chinese drywall was installed, as well as extensive property damage to the homes.   Overlook, 2011 W.L. 1988396, at *26. Travco employed this same reasoning.   Travco, 715 F. Supp. 2d at 718.[22]   This court agrees.   First, the court concurs that the focus should be on the sulfur gases that came from the drywall,

---

[21] However, subsequent decisions in this court have noted that the court should not resort to reference to classifications by regulatory regimes, unless such regulation is directly implicated by the case, like it was in City of Chesapeake. E.g., Kline, 474 F. Supp. 2d at 789 (calling reference to such statutes "unnecessary and inappropriate").

[22] Compare In re Chinese Manufactured Drywall, 759 F. Supp. 2d at 842 (finding that the Chinese drywall was not a pollutant because it caused only property damage).

not the drywall itself.  Id.[23]  The court finds it determinative that the sulfur gases caused extensive damage by corroding, pitting, blacking, and tarnishing metal components all over the home.   Under the definition of contaminant—"to soil, stain, corrupt, or infect by contact or association"—it is clear the reduced sulfur gases "corrupted" the wiring, pipes, and electronics rendering them unsafe for use.   See id. at 718, n. 9 (noting that another important factor to finding sulfur gas a contaminant when it caused the property damage was that it was present where it was not supposed to be); Mem. Opp. Mot. S. J. Ex. 2, at 12 (expert report submitted by DMC, which explains that the level of corrosion on wiring was unsafe).

Therefore, the court finds that the reduced sulfur gases from the drywall were a pollutant under the policies.

### D.

The final issue the court must decide is whether the pollutant reduced sulfur gases were the result of discharge, dispersal, seepage, migration, release or escape.   Citizens and Hanover argue that this is a question with an obvious answer:

---

[23] The Final Pretrial Order in this case makes it clear that no party contests that the drywall was the source of the sulfur gases in the homes, though they do not agree as to how those gases were formed.   See Docket # 86 ¶ 7 ("The Chinese drywall in the homes was defective and caused property damage to certain other components of the homes where it was installed."); see also supra note 2.

If the parties agree that the drywall had elevated levels of elemental sulfur, that the drywall resulted in the damage at the homes, and that the damage was caused by reduced sulfur gases, then it is clear that those gases were either discharged or released.  DMC again argues that the formation of the sulfur was a natural process, in which the elemental sulfur was exposed to air such that the compounds in the gas were formed, and, thus, there was no movement as required by the terms of the policy.

The policy does not define "discharge, dispersal, seepage, migration, release or escape," so the court again looks to the ordinary meaning of the words to interpret the policy, as have the other Virginia courts to consider this issue.  E.g., Overlook, 2011 W.L. 1988396, at * 13; Kline, 474 F. Supp. 2d at 798.  Of the terms relevant to this case, "discharge" means "to relieve of a charge, load, or burden," Webster's Third New International Dictionary 644, "disperse" means "to cause to break up and go in different ways," id. at 653, and "release" means "to set free from restraint, confinement, or servitude," id. at 1917.  Each of these terms carries some element of movement.

In its response to the insurers' Motion, DMC submitted as an exhibit the report of Gerald O. Davis, P.E.  See Mem. Opp. Mot. S. J. Ex. 2, Docket #56.  Mr. Davis is an expert hired by DMC to investigate the causes of the property damage at the two

developments.  In his report, Mr. Davis concluded that the damage to the homes was traceable to the Chinese drywall and was caused by reduced sulfur compounds.  Id. at 12.  In addition, the parties, as recounted above, agreed that the Chinese drywall was defective and caused the damage.  The court, therefore, finds this to be a clear case of dispersal, discharge, or release.  While it is not certain the exact process by which the elemental sulfur moved from the drywall into the atmosphere in gas form, it is clear that somehow it did so move.  When the parties agree that the source of the sulfur was the drywall and that the reduced sulfur gases caused the damage, there is no need to go through the academic exercise of determining the exact method of mobility when it is clear that the sulfur, somehow, moved out of the drywall and into the air.

Therefore, in sum, the court finds the pollution exclusion is not ambiguous and the reduced sulfur gases in this case were a pollutant that dispersed into the atmosphere causing the property damage.  Recovery under the 2007-2008 and 2008-2009 Citizens CGL policies and all of the Hanover excess policies is thus barred by the exclusion.[24]

---

[24] The 2005-2006 and 2006-2007 Citizens CGL policies remain before the court.  See Dragas Mgmt. Corp. v. Hanover Ins. Co., No. 2:10cv547, __ F. Supp. 2d __, 2011 W.L. 2982097 (E.D. Va. July 21, 2011)

IV.

Accordingly, the court **GRANTS** Citizens' and Hanover's Motion, determining that recovery under the 2007-2008 and 2008-2009 Citizens CGL policies and all the Hanover umbrella policies is barred by the absolute pollution exclusion. The Clerk is **DIRECTED** to forward a copy of this Opinion to counsel for all parties.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
United States District Judge

REBECCA BEACH SMITH
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 8 , 2011

28